E.Z. et al., Plaintiffs,

v.

Gregory COLER, et al., Defendants.

No. 82 C 3976.

United States District Court,
N.D. Illinois, E.D.

March 12, 1985.

**1548**

Allan E. Lapidus, Vedder, Price, Kaufman & Kammholz, Harvey Grossman, Legal Director, Roger Baldwin Foundation of ACLU, Chicago, Ill., for plaintiffs.

Jeffrey W. Finke, Stephen Kehoe, Kathleen Kreisel, Asst. Attys. Gen., Gen. Law Div., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

This matter is before the Court on plaintiffs' motion for a preliminary injunction. Over several weeks in late 1983 and early 1984, a preliminary injunction hearing was held on plaintiffs' motion. Subsequently, the parties filed extensive post-hearing briefs. The court has now reviewed the pleadings, the opening statements by counsel for the parties, the testimony of the witnesses, the final arguments of counsel, and the memoranda of the parties, and considered all of the evidence and law presented, including the exhibits received in evidence and the court's extensive trial notes, which include an appraisal of the witnesses and their credibility. In determining the credibility of the witnesses, the court took into account the witnesses' intelligence, ability and opportunity to observe, age, memory, manner while testifying, any interest, bias or prejudice the witness might have and the reasonableness of the testimony considered in light of all the evidence in the case. The court has drawn reasonable inferences from this evidence, and evaluated the legal principles presented by the parties and developed through legal research of the court.

### Background and Facts of the Case

Eight plaintiffs brought suit in June, 1982.[1] Plaintiffs are minor children and their parents who were the subject of child abuse investigations by the Illinois Department of Children and Family Services ("DCFS"). Defendants are the DCFS, its director, various administrators and caseworkers. Essentially, plaintiffs allege that a DCFS "pattern and practice" of routinely searching the bodies of minor children reported to be abused or neglected by their parents and the pattern and practice of conducting limited warrantless searches of homes in the course of investigating child abuse and neglect reports, violates the fourth amendment.[2] Plaintiffs seek a preliminary injunction, enjoining the DCFS: a) from conducting searches of minor children without consent of the parent[3] or without probable cause; and b) from conducting searches of the residences of such children and their parents or legal guardians without consent, or a search warrant issued upon probable cause.

Defendants maintain that existing detailed procedures governing DCFS child abuse investigations adequately protect plaintiff's constitutional rights. After the filing of this suit, the DCFS began using the Child Abuse and Neglect Investigation

---

1. Plaintiffs sought to bring their claims for injunctive and declaratory relief as a class action. The motion for class certification was denied. (See Order of August 23, 1983). Damages are also sought on behalf of the named plaintiffs. Plaintiffs have renewed their motion for class certification. The court finds the same obstacles to class certification that were outlined in its August 23, 1983 opinion still exist and therefore denies plaintiffs' motion to reconsider its denial of class certification.

2. Plaintiffs define the allegedly unconstitutional body searches and home searches as follows:
 The terms "body search," "strip search," "visual examination" or "visual inspection" refer to a situation where a DCFS investigative worker removes or rearranges clothing or causes same to be removed or rearranged from a child reported to be the subject of child abuse or neglect a portion of or all of the child's clothing so as to permit a visual inspection of the child's body.
 The terms "home search" and "search of the home" refer to entering, examining, inspecting or viewing any room or area in a person's dwelling other than the readily observable areas in the immediate vicinity of the place in which an interview of the occupants is being conducted.
 (Plaintiffs' Post-Hearing Brief In Support of their Motion for Preliminary Injunction—pp. 1–2).

3. Although the thrust of plaintiffs' argument is that parental consent to search the child should be obtained, plaintiffs also appear to seek consent of the child, for example in cases where the child is searched at school. (See Plaintiffs' Post-Hearing Reply Brief at pp. 18–19).

Decisions Handbook (Pl.Ex. 3) ("Handbook") and detailed procedures governing child abuse investigations. (Pl.Ex. 2) ("DCFS Procedures" or "Procedures"). The fledgling Division of Child Protection of the DCFS, formed in 1981 to meet the difficult and often life-threatening problem of child abuse, adopted the Handbook and Procedures to aid it in its work. The Handbook was drafted by the American Bar Association and Data Management Associates to provide guidelines to workers investigating child abuse. (Pl.Ex. 3, Coler Tr. 1202, Selinski Tr. 1479). The Handbook was the product of interviews with those who work in the child abuse field, including child protection workers, judges, police officers, the Director of the C. Henry Kempe Center for the Protection and Treatment of Child Abuse and Neglect and the Director of the National Legal Resource Center for Child Abuse Advocacy and Protection. (Selinski Tr. 1464–68).

### Current DCFS Procedures

The Handbook and Procedures provide the following methods for investigating child abuse reports. The DCFS receives reports of child abuse via a toll-free hot line which operates 24 hours a day, 365 days a year. Hot line calls must meet the following criteria before a DCFS investigation is commenced:

1. A child less than 18 years of age must be involved;

2. The child must either have been harmed, or be in danger of harm or of a substantial risk of harm;

3. A specific incident or circumstance which suggests the harm was caused by child abuse or neglect has been identified;

4. A parent or caretaker must be the alleged perpetrator of neglect;

5. A parent or other caretaker, an adult family member, an adult individual residing in the same home as the child, or the parent's paramour must be the alleged perpetrator of abuse.

---

**4.** The terms DCFS worker, caseworker and investigative worker are used synonymously throughout this opinion.

(Procedures Part 302.5(b), Pl.Ex. 2, pp. 10–11). If the above criteria are not satisfied, then an investigation is not commenced. If a report meets these criteria, an in-person visit with the reported child victim must begin within 24 hours. In the event of an emergency, the investigation must begin immediately, at any hour of the day or night. (Procedures Part 302.5(g)(1) and 302.5(g)(2), Pl.Ex. 2, pp. 23–24).

### The Interview

The DCFS worker [4] goes to the residence of the alleged child victim, introduces himself or herself to the parent and tells the reason for the investigation, making reference to the receipt of the child abuse or neglect report. Although the DCFS worker does not tell the parent or caretaker [5] that he or she has a right to refuse to admit the DCFS worker, a worker may not force his or her way in to see the alleged child victim. If access to the child is denied, the Procedures require that the DCFS worker explain to the parent or caretaker that Illinois law gives the worker the authority to see the children. If access is still denied, the DCFS worker must immediately contact local authorities and request immediate assistance in contacting the child. If necessary, the worker must pursue a court order. (Procedures Part 302.5(d)(7), Pl.Ex. 2, p. 21).

Once inside, the worker may observe those areas of the residence "reasonably related to the allegations of abuse or neglect." (Procedures Part 302.5(g)(3)(v), Pl.Ex. 2, p. 26; Conlee Tr. 358; Buhrmann Tr. 832–33). In addition, the worker may examine the body of the alleged child to victim, if needed, to verify the report of abuse. The Handbook provides:

> The worker should observe the child's body for evidence of physical abuse. When a physical examination is necessary to verify the allegation, the worker can select from the following options: The worker should consult with the caretaker and offer three options.

---

**5.** The term parent or caretaker refers to one or both parents or a child's caretaker or caretakers.

1. The caretaker can take the child to a physician or hospital emergency room for physical examination.

2. The worker will take the child to a physician or hospital emergency room for a physical examination.

3. The caretaker and the worker can jointly disrobe the child and conduct a cursory physical examination.

If the child is at school, the worker should attempt to contact the caretaker before having the school nurse examine the child. The caretaker should be provided with the above three options and a fourth one which involves having the school nurse examine the child. If the caretaker can not be reached, the worker should have the school nurse examine the child.

There are a number of restrictions which apply to the preceding options: They are: Physical examinations of children alleged to be sexually abused should be conducted by a physician or other medical personnel, not the worker. The first two options above apply in this situation. Although it is preferable that a physician conduct an exam, if physical examinations are performed by the worker and the caretaker or other adult, for children over 13 it *must* be conducted by a worker who is the same sex as the child. Similar examinations of school-age children under 13 *should* be conducted by a person of the same sex as a child. A child who is severely ill (see section 2.5.1, Medical Examinations) should immediately be seen by a physician. The first two options only apply in this situation.

Handbook, p. 66. If the report of child abuse alleges sexual abuse, the Procedures implemented as of December 1, 1983 require that examination of the child's body shall always be conducted by a physician.

### Plaintiffs' Proposed Relief

Plaintiffs contend that the above-outlined procedures are unconstitutional because the DCFS workers do not obtain fully informed consent or do not satisfy a probable cause standard before examining children or searching homes. Plaintiffs propose that no examinations or searches be conducted unless parents, informed that they have a right to refuse to cooperate, consent to the investigation or until a traditional probable cause standard is satisfied. Plaintiffs define such a probable cause standard as "specific articulable facts to believe that examination ... will reveal evidence of injury resulting from abuse or neglect...." Plaintiffs' Post-Hearing Brief in Support of their Motion for Preliminary Injunction—p. 61). Plaintiffs concede, however, that the worker may arrange for an immediate medical examination when he or she determines through interviews or observation of the child's behavior and/or readily apparent physical condition that immediate medical assistance is needed. *Id.* at pp. 50–51, 61.

### Standing of Plaintiffs' to Maintain Action for Injunctive Relief

Before reaching the merits of plaintiffs' claim, the court first turns to the plaintiffs' standing to maintain this suit for injunctive relief. At the preliminary injunction hearing, various plaintiffs and witnesses testified to the facts of individual child abuse investigations by the DCFS. All of the testimony concerned incidents occurring prior to April, 1981. As previously noted, it was not until 1981 that the Division of Child Protection of the DCFS was formed. At that time, child abuse investigation procedures were in their infancy. Then, in July, 1982, the Handbook (Pl.Ex. 3) was published and extensive amendments to DCFS Procedures became effective as of January 1, 1983.

Defendants point out that, since the individual incidents complained of occurred before new, more detailed procedures were adopted, plaintiffs have no standing to maintain this action since many of the incidents could not be repeated under the new procedures. For example, the alleged Z. incident, wherein a child was examined by a DCFS worker for signs of sexual abuse, could not be repeated since under the new procedures since only a doctor may now examine a child for evidence of sexual abuse.

Because much of the complained of conduct could not be repeated, defendants

maintain that the standing requirement, exemplified in *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), bars plaintiffs from seeking injunctive relief. In *Lyons*, the plaintiff alleged that he had been stopped for a traffic violation and, without provocation, Los Angeles police applied a choke-hold to him, rendering him unconscious and causing him injury. He also alleged that police routinely applied choke-holds in situations where they were not threatened with the use of deadly force. The Court found that because Lyons had not and could not credibly allege that the police always choked any citizen with whom they had an encounter and that Lyons would have another encounter with police, he lacked standing to seek injunctive relief. The Court found that any threat to Lyons from the alleged unlawful conduct was not real and depended upon the possibility that he would again have an encounter with the police and that either he would illegally resist arrest or detention or the officers would disobey their instructions and again render him unconscious without any provocation. Because Lyons was unable to allege that he would have another encounter with police and that all police always applied choke-holds in all citizen encounters or that the City authorized police officers to act in such a way, Lyons did not have the requisite personal stake in the outcome of the case to satisfy the standing requirement of Article III.

■ In contrast to *Lyons*, plaintiffs in the instant case do have a live controversy with the defendants, the DCFS and its agents. The plaintiffs allege that certain actions of the DCFS in investigating reports of child abuse violate plaintiffs fourth amendment rights. Specifically, plaintiffs allege that nude inspections of children, the warrantless searches of homes of possible victims and failure to implement a probable cause standard to govern investigation of abuse reports have occurred and continue to occur and that plaintiffs may be subjected to these alleged injustices if an injunction is not issued. Such allegations pose a situation which the Supreme Court found would have saved Lyons' claim; that the plaintiff can credibly allege that the practice he or she is challenging always occurs and that plaintiff has a realistic chance of being subject to the practice. Thus, unlike *Lyons*, the alleged unconstitutional conduct by government authorities is not speculative and dependent upon contingencies like the plaintiffs' potential criminal conduct and the governmental authorities' disobedience to their superiors as in *Lyons*.[6] The plaintiffs have alleged that they have been subjected to allegedly unconstitutional practices by the DCFS and that future child abuse report investigations will be conducted in a similarly unconstitutional way and that plaintiffs may therefore be subject to such practices absent injunctive relief.[7] *See*

**6.** As Judge Marshall noted when distinguishing *Lyons* and the *O'Shea* and *Rizzo* cases upon which *Lyons* relied:

The *Lyons* majority relied heavily on *O'Shea v. Littleton*, 414 U.S. 488 [94 S.Ct. 669, 38 L.Ed.2d 674] (1974) and *Rizzo v. Goode*, 423 U.S. 362 [96 S.Ct. 598, 46 L.Ed.2d 561] (1976). In our earlier opinion in this case, we distinguished *O'Shea* because, unlike in that case, the prospect of future injury here was not "conjectural." *Lewis v. Tully*, 96 F.R.D. [370] at 374–75 [ (N.D.Ill.1982) ]. The same distinction exists between this case and *Rizzo*. *In neither of those cases was a systematic, practically formal policy alleged or shown to exist; the plaintiffs based their allegations of future injury purely on a showing of past harm.* This case is plainly different from *O'Shea* and *Rizzo*. (emphasis added)

*Lewis v. Tully*, 99 F.R.D. 632, 641, n. 9 (N.D.Ill. 1983) (Marshall, J.).

Similarly, plaintiffs in the instant case have alleged a systemic, formal and written policy which they may realistically be subject to in the future. Plaintiffs do not base their claims of future injury solely on past harm, as plaintiffs did in *Lyons*. Moreover, the testimony of W.K., M.D. and S.H. regarding their family problems and disciplinary methods indicates that the likelihood of future DCFS investigations is not merely speculative.

**7.** The Z.'s, the only plaintiffs who were subject to an extensive home search, have now moved outside Illinois and are therefore not subject to Illinois DCFS investigations. However, another plaintiff, A.O., testified that the DCFS attempted to contact her child, S.H., at A.O.'s home. When A.O. refused to cooperate, the DCFS

*also, United States v. Peters,* 754 F.2d 753 (7th Cir.1985) (where acts complained of are "capable of repetition," actual controversy remains alive).

### Plaintiffs' Witnesses

At the preliminary injunction hearing plaintiffs presented witnesses who had been the subjects of DCFS child abuse investigations. Plaintiffs argue that these witnesses demonstrate the unreasonableness of DCFS child abuse investigation procedures. Contrary to plaintiffs' assertions, the testimony of these witnesses demonstrates that the DCFS acted reasonably in each situation to accomplish their statutorily mandated function, the protection of the dependent child.

One of the main themes of plaintiffs' presentation was that the DCFS investigations had a deleterious effect on the subject children. For example, B.D., a 12 year old boy, was examined at school pursuant to an anonymous report that B.D. had been beaten by his father with a belt on the back and buttocks (Pl.Ex. 61). The DCFS caseworker asked B.D. to pull his pants down so the caseworker could check his buttocks. (Tr. 101—B.D.). B.D. did so and testified that he never cried nor lost any sleep over the DCFS examination. (Tr. 107—B.D.). Although B.D. testified that a bruise on his buttocks was from bike riding, he also testified that he had been hit by his father with a one and one half inch belt, which caused him to cry. (Tr. 101, 110—B.D.). When asked on cross-examination whether his parents had argued about child discipline and whether his mother had said his father was abusing him, B.D. claimed not to remember. (Tr. 109–110—B.D.). The court finds B.D.'s claimed lack of memory not credible. Rather, B.D. appeared to be fearful of not properly parroting a rehearsed statement designed to cast his father in a favorable light.

Similarly, the court finds the testimony of A.O. regarding deleterious after-effects of a DCFS Investigation to be not credible and obviously rehearsed. A.O. was examined at school where he was asked to lift his shirt by a DCFS caseworker. (There is some dispute as to whether he lowered his pants.) (Compare DeStefano Dep. 270–275 & Tr. 88–89—A.O.). A.O. testified that his mother had been upset by the examination and A.O. felt that he had done something wrong. (Tr. 90–91—A.O.). The court finds that, rather than being a sincere description of A.O.'s feeling, this testimony was apparently an attempt to discredit the DCFS hot line report which triggered the examination of A.O.

In November, 1980, A.O.'s mother, S.H., had called the hot line and reported that her husband had become violent. (Pl.Ex. 73). She further stated that while A.O. had attempted to defend her, S.H.'s husband had kicked A.O. in the stomach and struck him in the arm, leaving a bruise. S.H. further stated that she wanted her husband out of the house before one of the children was "seriously hurt or killed." (Pl.Ex. 73).[8] Not only does this scenario indicate that A.O. may have wanted to cov-

---

worker interviewed S.H. at school. Also, three additional witnesses, Donnie G., Paula G. and Mary D., who plaintiffs point out could easily replace the Z.'s as plaintiffs, were also subject to home searches.

It is also unclear at this point in the instant litigation, whether the claims of the Z.'s must be dismissed for another reason. During the preliminary injunction hearing in this case, an affidavit was obtained by plaintiffs' attorneys from their client, plaintiff W.Z. The affidavit was purportedly signed by Tamara Stack. Essentially, the affidavit states that Stack was a neighbor of the Z.'s and was present during a nude search of E.Z. conducted by the DCFS. The affidavit purports to describe the search and its effect upon the child. At the preliminary injunction, the DCFS called Tamara Stack as a witness. Stack stated that she did not sign the affidavit and that her signature had been forged. The entire matter has been referred to the United States Attorney's Office which is currently investigating the matter.

**8.** Although the DCFS did not contact S.H. and A.O. until almost four months after S.H.'s call to the hot line, the delay was due partially to the DCFS' unsuccessful attempts to contact the family and to S.H.'s statements that the time was not appropriate for a visit. (Pl.Ex. 73). Additional delay was also caused by DCFS backlog of cases which had arisen at the beginning of the institution of the hotline system earlier that year. (De Stefano Dep. 38).

er up for his father, it also demonstrates that the actions of the DCFS were reasonable. DCFS procedures provide for examination of a child at school where allegations of a violent parent indicate that more risk to the child may be created if the parent is contacted. (See *infra*, p. 1558 n. 14). Against this background, the examination of A.O. at school was reasonable.

The testimony of Wendy K. also demonstrated to the court the reasonableness of DCFS Procedures. Wendy K. testified about one of the disciplinary methods she and her husband used with their three sons, ages 6½, 4½ and 2½. The method was referred by W.K. as the "happy stick," a pine stick 12 inches long, ⅝ inch thick and 1¼ inch wide, weighing three ounces. (Tr. 270–271—W.K.). Both she and her husband would hit their children one to three strokes with the "happy stick." (Tr. 271—W.K.) Following discipline with the "happy stick," the parent would have the child put away the stick, then talk about the problem with the child. Such a talk was referred to by Wendy K. as "loving them [the children] up." *Id.*

The use of the "happy stick" was described by Wendy K. to a caseworker who visited the K home in response to a non-anonymous report. The report had alleged that the reporter had seen welts on the 4½ year old child's face caused by Mr. K. slapping him. (Def.Ex. 42 (under seal)). The K.'s admitted to the caseworker that Mr. K. had slapped their 4½ year old son for "goofing off" at bedtime, with Wendy K. testifying that although she did not see Mr. K. slap their son, David, she "heard" the slap after Mr. K. "went upstairs" to discipline the children. (Tr. 274–76—W.K.). Mrs. K. further testified that during a follow-up visit by another caseworker about a month later, while the caseworker was examining the undressed children, that the caseworker told one child he had "a nice little penis." (Tr. 296—W.K.). Based on the flow of Wendy K.'s entire testimony and her overall demeanor, this statement was not believed by this court. In any case, in light of the substance of the report, and the disciplinary methods the K.'s described to the caseworker, the caseworkers' actions were appropriate.

Finally, the testimony of Mary D. also demonstrated that the DCFS again acted reasonably in the face of allegations of child abuse. The D. family was investigated in response to a non-anonymous report from a neighbor that Mary D. was not adequately supervising her children. (Def.Ex. 40). During the interview, Mary D. informed the caseworker that she had been tying her 18–20 month old son, Kevin, to the bed with what she described as a "noose" or a "bathrobe sash." (Tr. 216, 223, 256) (Pl.Ex. 100). Following the interview, the caseworker went through the upstairs bedroom area of the home. In view of Mary D.'s admission regarding Kevin and the "noose," and the other difficulties Mary D. described in managing her children, such DCFS action was reasonable.

■ In sum, when measured against the fourth amendment requirements governing administrative searches, the Court finds the individual searches described by plaintiffs witnesses to be proper. Moreover, as explained in the following analysis, the DCFS Procedures under which these searches were implemented, fall well within the confines of fourth amendment law.

### Administrative Searches and the Fourth Amendment

■ The DCFS procedures of which plaintiffs complain do raise fourth amendment considerations. When a case involves one's home and some type of official intrusion into that home, as this case does, the protections of the fourth amendment are called into play. *Wyman v. James*, 400 U.S. 309, 316, 91 S.Ct. 381, 385, 27 L.Ed.2d 408 (1971). Moreover, as plaintiffs correctly note, an individual need not be suspected of criminal behavior to invoke the protection of the fourth amendment. *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The individual's right of privacy cannot simply be determined by the nature of the search. *Id.; District of Columbia v. Little*, 178 F.2d 13, 17–18 (D.C.Cir.1949), *aff'd on other*

*grounds,* 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599 (1950).[9]

Thus, in *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), the Court set out the fourth amendment parameters governing administrative searches. Camara had refused on several occasions to allow San Francisco Public Health inspectors to make a routine annual inspection of his residence for violations of the city's housing code. Subsequently, a criminal complaint was filed against Camara, charging him with refusing to permit a lawful inspection in violation of the housing code. The code prescribed criminal penalties for refusing to allow an inspection. Camara sought a writ of prohibition against the municipal criminal court, claiming that the ordinance authorizing routine annual inspections was unconstitutional.

The Court agreed. Under the housing code, when an inspector demanded entry, the occupant had no way of knowing whether enforcement of the code required inspection of the premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself was acting under proper authority. *Id.* at 532, 87 S.Ct. at 1732. The only way the occupant could challenge the inspection was by refusing entry and risking criminal conviction under the code. The court found the practical effect of this system was to leave the occupant subject to the unbridled discretion of the inspector. It was this unbridled discretion which the Court found reprehensible, and thus it held that a warrant should be sought in such a context. *Id.* at 532–33, 87 S.Ct. at 1732–33; *accord Marshall v. Bar-*

*low's,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).[10]

In establishing the "probable cause" standard upon which an administrative search could be made, the *Camara* court used a balancing test, weighing "the need to search against the invasion which the search entails." *Id.* 387 U.S. at 537, 87 S.Ct. at 1735. The Court found that, because health and safety needs were at stake, the facts justifying a housing inspection search were clearly different from those that would justify a criminal investigation. Thus, the degree of probable cause needed for issuance of warrant to carry out a housing inspection was less than the degree of probable cause needed for a criminal search.

The *Camara* court was also careful to note that a warrant might not be required in every type of administrative search. *Id.* 387 U.S. at 533, 87 S.Ct. at 1733. The court stated:

In assessing whether the public interest demands creation of a general exception to the Fourth Amendment's warrant requirement, the question is not whether the public interest justifies the type of search in question, but whether the authority to search should be evidenced by a warrant, which in turn depends in part upon whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search. See *Schmerber v. State of California,* 384 U.S. 757, 770–771, 86 S.Ct. 1826, 1835–1836, 16 L.Ed.2d 908 [(1966)]. It has nowhere been urged that fire, health, and housing code inspection programs

---

**9.** Before 1967, courts followed the reasoning articulated in *Frank v. Maryland,* 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959), holding that administrative searches were not covered by the protections of the fourth amendment. In *Frank* the court found that health officials did not need a search warrant to enter a residence and investigate sanitation conditions. In 1967, the landmark companion cases, *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 and *See v. Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943, reversed *Frank v. Maryland* and held, for the first time, that administrative inspections of commercial and non-commercial premises are generally subject

to the warrant requirement of the fourth amendment. Subsequent decisions have outlined the constitutional protections surrounding administrative searches.

**10.** In *Marshall v. Barlow's,* the court held OSHA's warrantless inspection program invalid because of the unbridled discretion it vested in government officials. OSHA inspectors could "roam at will" throughout any industrial establishment to look for health and safety violations. *Id.* 436 U.S. at 320–21, 98 S.Ct. at 1824–25; *see also Bionic Auto Parts and Sales, Inc. v. Fahner,* 721 F.2d 1072 (7th Cir.1983).

could not achieve their goals within the confines of a reasonable search warrant requirement. Thus, we do not find the public need argument dispositive.

*Id.* at 533, 87 S.Ct. at 1733. However, it is precisely in the context of a home visit for child-welfare purposes that the Court found that a warrant was not required.

In *Wyman v. James*, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), the Court refused to impose the warrant requirement or a traditional probable cause standard in the context of a child-welfare visit by a state case worker. The plaintiff, Mrs. James, was receiving aid from the state of New York through the state's Aid to Families with Dependent Children Program (AFDC), administered pursuant to the Social Security Act. As a condition to receiving continued benefits, Mrs. James was required to allow a state case worker to make periodic home visits. The purpose of such periodic visits was to determine whether the child remained eligible for continued benefits and whether the home of a child receiving aid remained a safe and stable place for the child to live. Mrs. James' benefits were terminated because she refused to allow a state case worker to visit her and her infant son in their home. She contended that the regulations permitting such visits violated her first, third, fourth, fifth, sixth, ninth, tenth and fourteenth amendment rights.

The Supreme Court disagreed, finding that the caseworker's home visit at issue was not a search triggering traditional fourth amendment protection. Alternatively, the Court found that even assuming that the home visit was a search, it did not offend the fourth amendment. The Court reached this result by examining the focus of the home visit requirement. Because the focus of the home visit was the welfare of the *dependent* child, the intrusion was reasonable even without a warrant or probable cause. The Court explained:

> There is no more worthy object of the public's concern. The dependent child's needs are paramount, and only with hesitancy would we relegate those needs, in the scale of comparative values, to a position secondary to what the mother claims as her rights.

*Id.* at 318, 91 S.Ct. at 386. In fact, even though the home visit was not required by the Social Security Act, but was only performed pursuant to state law, the Court noted that the visit's "rehabilitative" and "service" orientation gave the visit a special status.

The Court distinguished the fourth amendment proscriptions set forth in *Camara* and its companion case, *See v. City of Seattle.* Unlike *Camara,* the refusal to admit the state agent in *Wyman* was not criminalized. The unwilling Mrs. James was not forced to risk criminal prosecution to object to the home visit as the home owner in *Camara* was. She could have simply refused the home visit and challenged it in subsequent proceedings. Although the Court recognized that the fruits of the caseworker's home visit might lead to criminal prosecution, it noted that such a result was simply an "expected fact of life and a consequence no greater than that which necessarily ensues upon any other discovery by a citizen of criminal conduct." *Id.* at 323, 91 S.Ct. at 389.[11]

### Application of Fourth Amendment Standards to DCFS Proceedings

■ Measuring the DCFS Procedures at issue here against the requirements surrounding administrative searches, the

---

**11.** It should be noted that the court did not assume that evidence gained in a child-welfare visit would necessarily be admissible in a criminal prosecution for child abuse. In fact, the recent case of *State v. Boggess,* 115 Wis.2d 443, 340 N.W.2d 516 (1983), indicates that traditional fourth amendment standards will be applied to criminal prosecutions for child abuse in which evidence garnered in a child abuse investigation is used. In *Boggess,* the court found the evidence was obtained under exigent circumstances, and therefore its use did not offend the fourth amendment. As the state aptly points out, even the sole dissenting justice in *Boggess* who would have granted the motion to suppress made clear that her decision was "in the context of criminal prosecution," "not in the context of a proceeding to protect the children." 340 N.W.2d at 527.

Court finds that such Procedures do not violate plaintiffs' fourth amendment rights.

## Official Discretion

In the first place, neither the entry into homes nor the examination of children involves the unbridled discretion which the *Camara* Court found reprehensible. Rather, these procedures fall much closer to the child welfare visits sanctioned in *Wyman* than to the housing inspections condemned in *Camara*. As in *Wyman*, the resident parent may refuse entry to the DCFS worker without risk of criminal prosecution. If entry is ultimately refused, the DCFS worker may invoke further legal processes to gain entry. Such processes sufficiently protect the non-consenting parent or caretaker.[12]

Moreover, unlike *Camara*, unbridled discretion to examine the body of the alleged child victim does not exist. The discretion of the worker is circumscribed by the hot line call standards. (DCFS Procedures Part 302.5(b), Pl.Ex. 2, pp. 10–11) and the Handbook (See Handbook p. 66). If the child is over 18 years old, if there are no allegations of harm or danger of a substantial risk of harm, if no specific incident or circumstance suggesting harm caused by child abuse perpetrated by a parent or caretaker is reported, no examination takes place. If an examination does take place, the worker is guided by the Handbook and Procedures. Although these factors may fall short of the more detailed level of probable cause desired by plaintiffs, the situation does not allow a level of unbridled discretion like that condemned in *Camara*. Moreover, even if the parent initially allows the worker to enter, the parent remains free to stop the investigation by refusing his or her continued cooperation.

12. The procedures at issue in *Wyman* afforded less protection for the family than the procedures at issue in the instant case. At issue in *Wyman* was whether the state could *require* warrantless searches as a condition of continued welfare benefits. In the instant case, however, the state does not seek to require warrantless searches. In fact, the DCFS Procedures are exactly to the contrary for, if the parent refuses to cooperate, further legal processes must be invoked.

## Consent

■ In fact, this manner in which entry is sought by the DCFS worker reflects the Supreme Court's often-stated understanding that most administrative searches are unobjectionable because they are conducted with consent. And the standards for consent to an administrative search are less stringent than the standards for consent to a criminal search. For example, in *United States v. Thriftimart, Inc.*, 429 F.2d 1006 (9th Cir.), *cert. denied*, 400 U.S. 926, 91 S.Ct. 188, 27 L.Ed.2d 185 (1970), consent to search a warehouse was found valid even though the consenting warehouse managers were not warned that they had a right to refuse entry. The Court traced the history of the consent doctrine in administrative searches and found that, absent coercion, knowledge of the right to refuse entry was not required. Later, even in the context of a criminal search, the Supreme Court found that the voluntariness of consent cannot be judged merely by the fact that a person does not have knowledge of his or her right to refuse entry. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Immigration and Naturalization Service v. Delgado*, — U.S. —, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).[13] Consent must be judged by the totality of circumstances and lack of knowledge of the right to refuse a search cannot, standing alone, invalidate consent. *Id.* In the administrative search context, courts have taken into account a number of factors, including whether there is evidence of intimidation, coercion or misrepresentation. *United States v. Kramer Grocery*, 418 F.2d 987 (8th Cir.1969).

Applying the consent doctrine as developed in the context of administrative

13. In *Delgado* the Court again affirmed that consent occurs even where a person is not told he has a right to refuse to cooperate with authorities:

While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.

104 S.Ct. at 1762–63.

searches, this court finds that plaintiffs consented to the home visits and examination of children at issue here. Plaintiffs contend that the consent obtained in the DCFS searches of homes and children was not voluntary because they were not specifically asked to consent or were not told that consent could be refused. Plaintiffs' claim that they complied with DCFS requests because they "had to do what he told me to" (Tr. 106—B.D.), or were "thunderstruck" (Tr. 1010—W.Z.), or felt they "had no choice" (Tr. 177—P.G.). The most lengthy explanation of one plaintiff's understanding of the circumstances in which consent was obtained was made by witness Mary D. Mary D. testified that she permitted the DCFS to enter because she "had been reading the newspapers" and thought that if she did not cooperate the DCFS would take the children away and that the DCFS worker told her that he could go get the police, come back and force her to let him look through the house and he could take the children away. (Tr. 210–211, 219).

However, other testimony indicates that plaintiffs were not coerced into admitting the DCFS worker or allowing examination of their children. Notably, S.H. admitted that she had originally called the DCFS for help because of family problems. (Tr. 1327–28—S.H.). S.H. and her husband had quarreled. *Id.* During the quarrel, S.H.'s son, A.O., had tried to intervene and was "pushed or shoved by my husband's foot and he fell backwards. He tripped backwards." (Tr. 1328—S.H.). In addition, witness Wendy K., while at first claiming that she had "no choice" (Tr. 269—W.K.) in admitting the DCFS, later testified that she consented to follow-up visits by a DCFS worker after the worker requested appointments. (Tr. 290, 299–W.K.). Wendy K. also testified that the K.'s attorney was present at the first follow-up visit and at the second follow-up visit another attorney from the K.'s attorney's firm, a Sister Margaret from the K.'s church and a policeman were present. (Tr. 300—W.K.). Wendy K. further indicated her understanding of the right of the DCFS worker to enter the K.

home when the K.'s were hesitant to make an appointment for a third follow-up visit.

Q Was there any discussion about removing the children from your custody at that meeting?

A Yes. While she was talking about making another appointment, my husband said, "Well, suppose we don't let you in this next time?"

She said, "If you don't let me in, I can get a court order and I can have the children removed from the home," that very night.

She turned to Officer Wolf and she said, "And you would have to serve that order, wouldn't you?"

Q Did you or your husband ever deny access to your home to Ms. Grossman?

A No, we did not.

Q Did you or your husband ever deny access to your children for Ms. Grossman?

A No, we did not.

(Tr. 303—W.K.).

Contrary to plaintiffs' legal assertions, the court finds the DCFS Procedures themselves and the plaintiffs' testimony regarding those procedures indicates that consent to enter homes and examine children was totally voluntary. Testimony of DCFS caseworkers indicated that plaintiffs' cooperation was never coerced. As previously noted, the procedures at issue do not allow the caseworker to force himself or herself into the home. If entry is refused in response to the DCFS' worker's explanation that he or she is authorized to enter the home to investigate allegations of abuse, the worker must seek a court order authorizing entry. Moreover, none of the plaintiffs testified to any facts indicating that their consent was not totally voluntary. On the contrary, several witnesses knew quite well that they had the power to refuse to cooperate with the DCFS. Mary D. understood that if she refused to cooperate, the DCFS worker would be forced to get a court order and the DCFS could ultimately take the children away. Wit-

ness Wendy K. did not testify to any facts indicating she felt coerced to grant an initial visit to the DCFS when first contacted by phone for an appointment. Certainly the K.'s cannot be heard to complain that their consent to subsequent DCFS visits was involuntary when persons such as their lawyer, a nun and a policeman were present. At best, all plaintiffs and their witnesses can offer is that they did not know that they had the right to refuse entry to the DCFS. With the DCFS Procedures in mind and the emergency circumstances of the visits complained of, lack of knowledge of the right to refuse simply cannot invalidate consent.

### Reasonableness of Searches

Not only are the DCFS Procedures at issue herein lawful because they are conducted with consent, the Procedures are justified under the teaching of *Wyman* and *Camara* and the entire fabric of fourth amendment jurisprudence. That jurisprudence teaches that the fourth amendment prohibits only unreasonable searches. *E.g.*, *Wyman*, 400 U.S. at 318, 91 S.Ct. at 386. The warrant and probable cause requirement are necessary in most cases to insure such reasonableness. But reasonableness can only be ascertained by considering the purpose of the search. A warrant or probable cause will not be the sole measure of reasonableness where it would frustrate the governmental purpose behind the search. *Id.* at 318–24, 91 S.Ct. at 386–89; *Camara*, 387 U.S. at 533, 87 S.Ct. at 1733. In the instant case, the court finds that present DCFS Procedures meet the fourth amendment's requirement. Further, this court finds that the imposition of a warrant requirement or a probable cause—search warrant standard upon the DCFS would make it impossible for it to achieve its purpose—protection of the life and health of the dependent child.

In the first place, when the DCFS receives a report of abuse or neglect, quick action is essential. Common sense alone indicates that the fastest way to verify an abuse or neglect allegation is to observe the child. To that end, the Procedures and state law provide for action within 24 hours of the report of abuse. Although the preferred procedure is for the DCFS to contact the parent or caretaker before examining the child, if the parent cannot be reached, a child may be examined without parental knowledge. Notably, DCFS Procedures provide for examination of the child at school where allegations of a violent parent indicate that more risk to the child may be created if the parent is contacted.[14]

The plaintiffs strenuously object to the fact that abuse reports, many of which are anonymous hot line reports, are sufficient to trigger an examination of the child's body by the DCFS worker. Plaintiffs would first require that a worker interview the parent and satisfy various requirements before seeking to interview the child to see if there is any validity to the report.[15] If the parent refuses to cooperate, the worker would then be required to go to independent sources, such as teachers, neighbors and friends to corroborate the report. Apparently, the worker would say something like, "Somebody has called and said so-and-so is abusing her child. Do you know if this is true or not?" If the independent source does not corroborate the report, the investigation must end. If the report is corroborated, the worker would then be allowed to resume interview efforts with the parent and child. At this point, the worker may search the child's body for evidence of abuse, if and only if, specific articulable facts exist which would lead a reasonable person to believe that an examination of a child's body would reveal evidence of abuse.

---

**14.** Even plaintiffs' expert recognized the necessity for examination of the child away from the home in the face of potential harm by a violent parent. (Tr. 801).

**15.** Plaintiffs also suggest that the interview include full disclosure of the report of abuse and the DCFS' interpretation of the report. Parents

shall be asked to address the allegations of the report and identify witnesses or other evidentiary sources to corroborate their story. Children may be interviewed only after notice to the caretaker and the worker must make a good faith attempt to contact the caretaker who shall be allowed to speak to the child before the interview occurs.

Not only would such a proposed procedure require more manpower and a larger budget, the more serious problem with the procedure is that a delayed examination of a child may simply come too late to protect a child in imminent danger of grave bodily harm or even death.[16] Unfortunately, there is no quicker way of knowing whether a child is at grave risk than by an actual examination of the child. Even assuming that most abuse situations are not life-threatening, this court finds that the life of even one child is too great a price to pay for the possible increased degree of parental privacy through additional preliminary investigation which plaintiffs' proposed procedure would demand.[17] *See Division 241 Amalgamated Transit Union (AFL–CIO) v. Suscy,* 538 F.2d 1264 (7th Cir.1976).

▆▆▆ Therefore, plaintiffs' argument that DCFS child abuse investigation Procedures violate their right of privacy under the ninth and fourteenth amendments must also fail. Although these amendments do protect familial privacy, *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the right to familial

privacy does not prevent the state from protecting the dependent child from harm at the hands of a parent or caretaker. *Wyman v. James,* 400 U.S. 309, 318, 91 S.Ct. 381, 386, 27 L.Ed.2d 408 (1971).

Plaintiffs' contention that immediate investigation of the abused child is like responding to a murder allegation by going to the alleged murder site and breaking down the door is simply a false analogy. (Tr. 1851). When police are investigating a crime, investigation is generally after the fact and no immediate threat to the life of a dependent child is present. In such a routine criminal investigation, absent exigent circumstances and a few other exceptions, a warrant must be obtained before searching. However, in the case of child abuse triggered by a hot line report, there should be some physical manifestation that the child has been recently abused. In many cases, the physical manifestation of abuse will be readily apparent to a trained child welfare worker. The fact that an immediate examination of the child can verify the allegation of abuse and, if abuse is present, take immediate steps to protect

16. One respected authority has suggested that 50 percent of children who are hospitalized for child abuse will be dead within a year—victims of another episode of child abuse. *See* Fraser, *A Glance at the Past, a Gaze at the Present, a Glimpse at the Future: A Critical Analysis of the Development of Child Abuse Reporting Statutes,* Chicago-Kent L.Rev. 635, 643 n. 7 (1978). In Illinois 71 children lost their lives as the result of child abuse during a recent 12-month period. (Def.Ex. 21, p. 9). Over 4,200 Illinois children were found by the DCFS to be in imminent danger. *Id.* p. 12.

17. The problem with the delayed investigation plaintiffs propose is exemplified by their own evidence. Plaintiffs' expert, Dr. Littner, testified that in 75 percent of the families he had experience with, the child will ultimately be able to remain with the family (Tr. 751); in 25 percent of the families the child's life is in immediate danger and the child will have to be removed from the home to protect the child's life (Tr. 750–52). Dr. Littner also testified that, once an investigation begins, the abuse stops in the 75 percent non-life threatening situations. *Id.* For the 25 percent life-threatening situations, Dr. Littner testified that a well-trained social worker should be able to immediately recognize the danger and, in such cases, would not need to risk the child's life by further delaying the inves-

tigation. (Tr. 759). The court simply finds no evidence to indicate that this hypothetical social worker will be as omniscient as plaintiffs postulate. Prediction of violent behavior, even by psychiatrists and psychologists, is at best, an inexact science.

In addition, defendants' expert, Dr. Newberger, testified that timely observation of a child is essential because signs of abuse may disappear within 24 to 48 hours. If no signs of abuse remain, the abuse will go undetected and the child will go unprotected even though in need of help.

Moreover, statistics adduced at the hearing indicate that a quick response to abuse reports are needed. During fiscal year 1982, 111,736 calls were made to the child abuse and neglect hotline. (Def.Ex. 21, p. 5). Of these calls, 33 percent (Def.Ex. 21, Figure 1, p. 6) satisfied the five criteria required to constitute a report of child abuse or neglect. Twenty-four percent of all reports concern children two years of age or less. (Def.Ex. 21, Table 6, p. 4). Forty-four percent of all reports concern children five years of age or less. *(Id.).* Over 62 percent of the allegations concerning torture, over 60 percent of the allegations concerning sexual abuse were found to be accurate. Also, over 57 percent of reports alleging abuse resulting in death of the child victim were found to be accurate. (Def.Ex. 21, Table 10, p. 9).

the child, differentiates the investigation of child abuse from the investigation of routine criminal matters. The strong governmental interest in taking immediate action to protect the child justifies the immediate investigation and points up the fact that other delayed methods of investigation will likely hinder the governmental purpose—protection of the dependent child. As Judge Bua noted in a similar case, requiring child abuse investigators to meet a probable cause standard or obtain a warrant ignores the difficulty of collecting any evidence other than anonymous tips and unverified reports in child abuse investigations.[18] *Darryl H. v. Coler*, 585 F.Supp. 383 (N.D.Ill.1984).

In sum, requiring plaintiffs to meet a probable cause standard or to obtain a warrant ignores the problems resulting from children who are not old enough to speak, children who will not admit to being abused, parents who will not admit to abusing their children, parents who are unaware that their children are being abused.

(Defendants' Post-Hearing Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction—p. 7). It is simply not possible to define a standard which must be met in every case before an investigation can proceed without endangering the lives of innocent children. The current DCFS Procedures, by limiting the home visits and the examination of childrens' bodies to those necessary to verify the abuse allegations, insure that reasonable cause to investigate exists.[19] Moreover, the subjects of investigation can refuse to cooperate at any time during the investigative process, in which case police aid or a warrant must be sought.

### Contact with Third Parties

■ In a similar vein, plaintiffs' suggestion that the investigating case worker corroborate abuse reports with neighbors,

---

**18.** The plaintiffs' objections to anonymous reports ignores the fact that anonymity often encourages reporting of abuse which would otherwise go undetected. (Tr. 1899). Anonymous callers are often family members who have sensitive information and who are only willing to give anonymous reports. If reliance on such anonymous reports is not permitted and the parent refuses to cooperate and third parties contacted have no knowledge of any abuse, the child is left at the mercy of the caretaker.

**19.** The most recent Supreme Court decision regarding school searches confirms that the traditional probable cause standard may be modified where such a standard would frustrate the governmental purpose behind the search. In *New Jersey v. T.L.O.*, —— U.S. ——, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the Court found that school officials need only "reasonable grounds for suspecting" that a search will turn up evidence that the student has violated or is violating either the law or the rules of the school. *Id.* at ——–——, 105 S.Ct. at 742–745. The Court similarly held that to require school officials to obtain a warrant before searching a child suspected of carrying contraband would also frustrate the disciplinary purpose behind the search. *Id.* at ——, 105 S.Ct. at 742.

*T.L.O.* also confirms the reasoning of *Doe v. Renfrow*, 475 F.Supp. 1012 (N.D.Ind.1979), *aff'd in relevant part*, 631 F.2d 91 (7th Cir.1980) (per curiam), *cert. denied*, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981), which held that "reasonable cause to believe" that a student possesses drugs is sufficient to trigger a search of the student by school officials.

Moreover, *Doe* did not forbid nude searches of children in every setting, as plaintiffs seem to contend. On the issue of a nude search of a student for drugs, the Seventh Circuit's opinion in *Doe* adopted the district court's reasoning. The district court, in turn, had held that the alert of a drug detecting dog, standing alone, was insufficient to create "a reasonable cause to believe" that the student possessed drugs. 475 F.Supp. at 1024. Since the dog alerted only to the odor of marijuana and not to the substance itself, the alert of the dog could not provide reasonable cause.

However, in the instant case, a report meeting the five criteria governing abuse reports (DCFS Procedures Part 302.5(b)), (Pl.Ex. 2, pp. 10–11) would provide ample reasonable cause to believe that child abuse had occurred and thus justify an examination of the child's body to verify the allegation. Moreover, in *Doe*, although the problem of school drug abuse was a serious threat to the educational environment, the situation in *Doe* was not so grave as to call for such immediate action as a nude body search. Seeking further cause to search would not have totally frustrated the purposes of the school searches. However, in the instant case, the need for immediacy is much greater. The life of an undisputably innocent child is in the balance.

teachers and friends prior to examining the child must also be rejected for another reason. Not only would contact with third parties delay investigation and thus expose the child to greater risk, third party contact would be even more invasive of the parental privacy which plaintiffs seek to protect. The fact that an investigative worker has gone to neighbors, etc., to discuss accusations of child abuse leveled against a parent is an event that is surely going to be remembered and probably repeated by the third party. Sharing an abuse report with a third party could stigmatize an accused abuser or family forever. Such a result would be especially unfair if the abuse report is ultimately found to be untrue as is often the case. The privacy interests of the child also militate against going to outside sources except as a last resort. Clearly a child, even before reaching adulthood, may wish that a report that he or she was abused by a parent or parents had never been publicized, even if true.[20]

Contacting third parties before verifying an abuse report by examination of the child's body may also create unnecessary hostilities between the worker and parent, thus detracting from the rehabilitative purpose of the child abuse investigation. Defendant's expert, Dr. Newberger, pointed up the rather obvious problem that DCFS inquires to third parties would likely get back to the family of the accused parent. The parent would undoubtedly be angered by such public disclosures, causing them to reject DCFS' rehabilatative efforts to help the family. Such rejection might force the DCFS to seek court intervention leading to a more adversarial and intrusive intervention into the family, all to the ultimate detriment of the dependent child.[21] In truth, plaintiffs' proposal to involve third parties in the investigation process would result in more intrusive governmental action and less protection for the dependent child and family.

### Use of Medical Personnel

 Finally, this court finds that use of medical personnel or trained health-care workers is not necessary or required to make the Procedures at issue pass constitutional muster. Plaintiffs claim that the state's failure to use medical personnel or health-care workers makes its child abuse investigation procedures unreasonable. Plaintiffs also contend that medical personnel would be better able to detect child abuse when examining the child. The court finds that, while more highly trained investigative workers may be desirable, doctors or nurses are not required to be

---

**20.** The *Wyman* court implicitly recognized that contact by the state of outside sources would be more invasive of the individual's privacy. The court stated:

Privacy is emphasized. The applicant-recipient is made the primary source of information as to eligibility. Outside informational sources, other than public records, are to be consulted only with the beneficiary's consent. 400 U.S. at 321, 91 S.Ct. at 387. One of the plaintiffs in the instant case, S.H., similarly believed that revealing the report of child abuse to outside sources would be more invasive of her privacy. S.H. testified that she did not want the worker to talk to her child at school because such outside contact would cause embarrassment to her son and harm to her family.

Plaintiffs' attempt to bolster their suggestion to consult outside sources by claiming that current DCFS Procedures listed on pp. 42–43 of the Handbook already require contact with outside sources does not bear scrutiny. The third parties referred to on pp. 42–43 of the Handbook are law enforcement officials or other persons who are believed to have first-hand knowledge of the incident, injury, and/or the family's circumstances. (emphasis supplied).

**21.** The uncontradicted testimony of defendants' expert, Dr. Newberger, also noted that a striking factor that emerged from studies of families where abuse occurs is their isolation from people and from the helping agencies of society. (Tr. 1898). Dr. Newberger opined that the anger caused by workers disclosing abuse reports to third parties would undermine the prospects for a rehabilitative relationship between the family and the state, increasing the family's isolation. (Tr. 1899). *See also* Fraser, *A Glance at the Past, A Gaze at the Present, A Glimpse at the Future: A Critical Analysis of the Development of Child Abuse Reporting Statutes,* 54 Chicago-Kent L.Rev. 635, 644 (1978). Mr. Fraser, as Director of the National Committee for Prevention of Child Abuse, also noted that isolation of the parent is a factor indigenous to child abuse. The isolation of the abusive parent also suggests that corroboration by outside sources would be unlikely.

brought along to satisfy the fourth amendment.

Although the testimony of both plaintiffs' and defendants' witnesses established that a doctor may be best able to detect and diagnose child abuse, a properly trained person, whether social worker or doctor, can properly detect and diagnose child abuse. The testimony established that it is not the title of the worker that is important, but the training. An improperly trained doctor or health-care worker may make mistakes in diagnosing child abuse, just as a person without a medical background may do. However, non-medical personnel can be trained to properly detect and diagnose child abuse. The DCFS Procedures envision such a properly trained worker and professional personnel are currently used.

Even assuming, for purposes of the constitutional argument, that the DCFS worker is not the ideally trained worker which the experts agreed was best, that fact does not make the procedures unreasonable, much less unconstitutional. There is no evidence to indicate that an improperly trained worker found abuse where none existed, but rather the plaintiffs' contention is that non-medical personnel may miss an incident of abuse. Even if true, occasional failure to detect child abuse does not make the procedures unreasonable. The fact that the state is not always meeting the ideal is not enough to warrant this court's intervention. Moreover, the use of medical personnel would invariably result in greater expense to the state. The Illinois child abuse prevention program is in its infancy and the DCFS has made and is making continuing strong efforts to improve its child abuse investigation techniques within budget limitations.

### Standards for Injunctive Relief

In light of the foregoing analysis, the court finds that plaintiffs have not satisfied the standards necessary to the issuance of a preliminary injunction.

In an attempt to reconcile numerous precedents regarding the requirements needed to obtain a preliminary injunction, the Seventh Circuit recently issued an opinion, *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380 (1984). *Roland* sets forth the following standards that the plaintiff must satisfy in order to obtain preliminary injunctive relief.

1. No adequate remedy at law. This is not the equivalent of irreparable harm but means that harm to the plaintiff cannot be rectified by a final judgment. In other words, the plaintiff must show that damages at the end of a trial will be seriously deficient as a remedy.

2. Irreparable harm. The requirement applies where plaintiff seeks equitable relief (implying that he has no adequate remedy at law), and means that plaintiff will suffer harm before final judgment.

3. The harm to the defendant if the preliminary injunction is granted must be weighed against the harm to the plaintiff if the preliminary injunction is not granted. Harm to the defendant is harm that would not be cured by the defendant ultimately prevailing in trial or by being fully compensated by the injunction bond.

4. Some likelihood of success on the merits, that is a better than negligible chance. This factor, likelihood of success, must be viewed in conjunction with the third factor, balancing the harms. The more likely plaintiff is to succeed, the less the balance of the harms must weigh in his favor (Referred to as the sliding scale approach).

5. The public interest must be considered if the preliminary injunction will have consequences beyond the immediate parties.

6. Whether the purpose of the preliminary injunction preserves the status quo must also be considered.

Applying these standards to the facts of the instant case, the court finds that none of the standards have been satisfied. Since the searches at issue are conducted with consent, the plaintiffs have no likelihood of success in asserting their constitutional claim. Even assuming that consent is lack-

ing, the questioned procedures are reasonable and therefore meet the requirements of the fourth amendment. Even assuming that plaintiffs ultimately prevail, money damages can adequately compensate them and all others similarly situated for their alleged loss of privacy. In addition, the balance of harms tips strongly in favor of the defendant. If the injunction were granted and a probable cause or warrant requirement were imposed on the DCFS, it is likely that some child abuse would go undetected and some innocent lives unprotected. The harm resulting from such failure to detect child abuse, injury or death to a child, is much greater than the harm plaintiffs will suffer if the preliminary injunction is not issued. Although plaintiffs may suffer loss of privacy, such a harm is not as great as injury or death to an innocent child. In addition, the status quo would not be preserved by new standards being imposed upon the DCFS pending a trial on the merits.

## Conclusion

Since the standards for injunctive relief have not been satisfied, plaintiffs' motion for a preliminary injunction is denied. This court's analysis of applicable law establishes that imposition of the warrant requirement or a probable cause standard upon DCFS investigations would disserve the public interest. Requiring a warrant or probable cause would hinder effective child abuse investigations and could result in death or injury of abused children.