801 F.2d 893
 93 A.L.R.Fed. 501
 DARRYL H., et al., Plaintiffs-Appellants,
v.
Gregory COLER, Director, Illinois Department of Children and
Family Services, et al., Defendants-Appellees.
B.D. by C.D., et al., Plaintiffs-Appellants,
v.
Gregory COLER, Director, Illinois Department of Children and
Family Services, et al., Defendants-Appellees.
 Nos. 84-2757, 85-1611.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 11, 1985.
Decided Sept. 9, 1986.
 
 Patrick T. Murphy, Patrick T. Murphy, Ltd., Chicago, Ill., Allan E. Lapidus, Vedder Price Kaufman & Kammholz, Chicago, Ill., for plaintiffs-appellants.
 Jeffrey W. Finke, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.
 Before WOOD, COFFEY and RIPPLE, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 In these consolidated appeals, the appellants challenge the constitutionality of a procedure utilized in child abuse investigations by the Illinois Department of Children and Family Services (DCFS). Specifically, as these cases reach us today, the plaintiffs allege that the DCFS policy which permits the caseworker to conduct a physical examination of the child's body for evidence of abuse violates rights protected by the fourth and fourteenth amendments. A final resolution of this issue will require the reconciliation of very fundamental constitutional values: the privacy rights of the child; the privacy rights of the family in the important area of childrearing; and the obligation and right of responsible government to deal effectively with the stark reality of child abuse in our society, a problem the seriousness of which has only been appreciated fully in recent times and in which the methods of identification and prevention must still be termed developmental.[1]
 
 
 2
 On this appeal we are not required to accomplish a definitive reconciliation of these competing constitutional value concerns. Indeed, it would be inappropriate to do so. These cases are here at very preliminary stages of the litigation process. In one case, we must determine whether the district court abused its discretion when it refused to grant a preliminary injunction prohibiting use of the challenged procedure pending a determination of its constitutionality. In the other, we must decide whether the district court erred when it granted the defendants' motion for summary judgment. Although we cannot entirely accept the reasoning of the district courts in either case, we believe, for the reasons set forth in the following paragraphs, that, in each case, the judgment must be affirmed.
 
 
 3
 * Introduction
 
 
 4
 The DCFS is a state agency charged with responsibility for receiving and investigating alleged cases of child abuse. Ill.Rev.Stat. ch. 23, p 2057.3. Illinois has given the DCFS a mandate to "protect the best interests of the child, offer protective services in order to prevent any further harm to the child and to other children in the family, stabilize the home environment and preserve family life whenever possible." Id. at p 2052. In an attempt to fulfill this mandate, the DCFS enlisted the assistance of physicians, attorneys, law enforcement officers, social workers and many others. Based upon the advice of these professionals, the DCFS developed and implemented a comprehensive plan for preventing, detecting and treating child abuse. The agency adopted uniform guidelines for investigating the thousands of cases of alleged child abuse it receives each year. These procedures are articulated in Illinois Department of Children and Family Services, Child Abuse and Neglect Investigation Decisions Handbook (1982) [hereinafter cited as Handbook ], Pl.Ex. 3, and in a 1983 policy memorandum from Gregory L. Coler, Director of DCFS, to Administrative and Service Staff, entitled "Procedures Implementing Rulemaking" [hereinafter cited as Memorandum], Pl.Ex. 2. The Handbook establishes five criteria (hot-line criteria) which must be met before the DCFS will investigate allegations of abuse or neglect. To constitute a report which requires further investigation, the DCFS must receive information that:
 
 
 5
 (1) a child less than eighteen years old is involved;
 
 
 6
 (2) the child was either harmed or in danger of harm;
 
 
 7
 (3) a specific incident of abuse is identified;
 
 
 8
 (4) a parent, caretaker, sibling or babysitter is the alleged perpetrator of neglect; or
 
 
 9
 (5) a parent, caretaker, adult family member, adult individual residing in the child's home, parent's paramour, sibling or babysitter is the alleged perpetrator of abuse.
 
 
 10
 Memorandum at 10-11. A report which meets the hot-line criteria receives a priority ranking based on the risk to the child, and a DCFS caseworker is assigned to investigate the allegations. Handbook at 33; Memorandum at App. G. Following the procedures outlined in the Handbook and the Memorandum, the caseworker begins a "fact-finding process which is designed to determine if credible evidence of abuse or neglect exists." Handbook at 33.
 
 
 11
 The investigation includes interviews with the child and his caretaker, Handbook at 42; observation of the child's home environment to determine whether it may be injurious to the child's health or safety, Memorandum at 26; and an examination of the child to verify allegations of physical abuse, Handbook at 66. According to the Handbook, when a physical examination is deemed necessary, a caseworker should consult with the caretaker and select one of the following options:
 
 
 12
 (1) require the caretaker to take the child to a physician for a physical examination;
 
 
 13
 (2) take the child to a physician for a physical examination;
 
 
 14
 (3) disrobe the child and conduct a cursory physical examination while the caretaker is present; or
 
 
 15
 (4) permit the school nurse to examine the child.
 
 
 16
 Id. Only three restrictions apply to the examination:
 
 
 17
 (1) in cases of sexual abuse, a physician shall conduct the examination;
 
 
 18
 (2) an examination of a child over age thirteen must be conducted by a caseworker of the same sex; and
 
 
 19
 (3) a severely ill child should immediately be seen by a physician.
 
 
 20
 Id. Unless there are grounds for taking the child into temporary protective custody, neither the Handbook nor the Memorandum provides any guidelines for a situation in which the caseworker and caretaker are unable to agree on one of the options. Following the interviews, observations, and examinations, the caseworker files a report containing a recommendation for further investigation or a conclusion that the allegations were unfounded. Memorandum at 32.
 
 
 21
 In the cases before us, children were required to disrobe and to permit the caseworker to examine their bodies for evidence of abuse or neglect.[2] Arguing that the DCFS procedure was an unreasonable search prohibited by the fourth amendment and a violation of the family's right to autonomy protected by the fourteenth amendment, the plaintiffs filed suit in district court. In B.D. by C.D. v. Coler, No. 84-2757, the plaintiffs seek preliminary injunctive relief; in Darryl H. v. Coler, No. 85-1611, the plaintiffs seek retrospective money damages. Although consolidated for appeal, the facts and procedural history of these cases require us to consider them separately in this opinion.
 
 II
 
 22
 B.D. by C.D., et al. v. Coler, et al.
 
 A. Facts
 
 23
 In 1982, eight families filed suit against the administrators and caseworkers of the DCFS. Each plaintiff alleged similar instances in which DCFS caseworkers required them to disrobe for a physical examination as part of a DCFS investigation of alleged child abuse.[3] At oral argument, counsel noted that only the cases of two plaintiffs, B.D. and A.O., are now before this court. In April 1981, the DCFS received an anonymous report that B.D., a ten-year-old boy, had been beaten by his father. After speaking with the principal at B.D.'s school, the caseworker required B.D. to remove his pants and examined his back and buttocks. In November 1980, A.O.'s mother contacted the DCFS seeking family counseling. During the conversation, she revealed that A.O. had been kicked and shoved by his stepfather. Four months later, a caseworker interviewed A.O. at school and required him to remove his shirt and pants as part of an examination for evidence of abuse.
 
 B. Proceedings in the District Court
 
 24
 The plaintiffs filed suit seeking declaratory and injunctive relief and money damages. They argued that the DCFS investigatory procedures violate the fourth amendment's prohibition against unreasonable searches and the right to privacy protected by the fourteenth amendment. The plaintiffs filed motions seeking: (1) to be certified as a class representing all of the children and parents in the State of Illinois; (2) to amend their complaint to include additional parties; and (3) to obtain a preliminary injunction prohibiting the DCFS from conducting searches of minor children without consent of the parent or probable cause. After extensive hearings, which included substantial testimonial evidence, the district court denied the plaintiffs' motions.[4] The court concluded that the plaintiffs had failed to establish any of the criteria necessary for preliminary injunctive relief. E.Z. v. Coler, 603 F.Supp. 1546, 1562 (N.D.Ill.1985). The district court first focused on the plaintiffs' likelihood of success on the merits. After concluding that the fourth amendment applied to the investigative procedures, the court found that, based on the evidence presented at the hearings, the physical examination was a reasonable search which did not violate the fourth amendment, and found that the plaintiffs consented to the searches. Id. at 1562-63. The court also held that the right to family autonomy was not absolute and, in this case, was outweighed by the state's interest in protecting the children. Id. at 1559.[5]
 
 
 25
 Turning to the other criteria for preliminary injunctive relief, the court held that money damages could adequately compensate the plaintiffs for their alleged lack of privacy. Moreover, held the court, the "balance of harms" tips strongly in favor of the defendant. If the injunction were granted, it is likely that "some child abuse would go undetected and some innocent lives unprotected." This harm, concluded the district court, is much greater than the loss of privacy in cases where application of the hot-line criteria produces a false alarm.
 
 C. Standard of Review
 
 26
 In reviewing the decision of a district court to grant or deny a preliminary injunction, this court has continued to invoke the phrase "abuse of discretion" in articulating the applicable standard. Lawson Products, Inc. v. Avnet, Inc., 782 F.2d 1429, 1438 (7th Cir.1986). However, we have also acknowledged that "the term 'discretion' has been sapped of its vitality through over-use and misuse," id. at 1436, and, in the context of the preliminary injunction action, can only be understood by reference to the precise task before the district judge when he considers such a motion. Therefore, to properly understand our role on review, we must carefully analyze the process employed by the district court.
 
 
 27
 As we noted in Lawson Products, 782 F.2d at 1436, the district judge, in considering a motion for preliminary injunction, must take a number of non-discretionary actions:
 
 
 28
 (1) He must evaluate the traditional factors enumerated in the case law: whether there is an adequate remedy at law, a danger of irreparable harm, some likelihood of success on the merits. See Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386-88 (7th Cir.1984).
 
 
 29
 (2) He must make factual determinations on the basis of a fair interpretation of the evidence before the court.
 
 
 30
 (3) He must draw legal conclusions in accord with a principled application of the law.
 
 
 31
 "Once all the equitable factors are before the judge, however, a classic discretionary decision must be made involving how much weight to give individual components of the calculus and to what direction the balance of equity tips." Lawson Products, 782 F.2d at 1436. This "classic discretionary decision" must, however, be a disciplined one which takes into consideration the early stage of the litigation. The "district court must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest.' " Id. at 1433. This latter factor--the public interest--takes on special importance in constitutional cases such as this one where the outcome will undoubtedly affect countless persons. Cf. Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc., 784 F.2d 1325, 1334 (7th Cir.1986).
 
 
 32
 In exercising his "seasoned judgment," Roland Machinery, 749 F.2d at 388, the district judge must keep in mind that, while preliminary injunctions are an interlocutory form of relief, they are also "an exercise of a very far-reaching power," Warner Bros. Pictures, Inc. v. Gittone, 110 F.2d 292, 293 (3d Cir.1940) (per curiam), and, consequently, "one in which the stakes are sufficiently high to make mistakes very costly." Lawson Products, 782 F.2d at 1433. Therefore, as we said in Roland Machinery:
 
 
 33
 the task for the district judge in deciding whether to grant or deny a motion for preliminary injunction is to minimize errors: the error of denying an injunction to one who will in fact (though no one can know this for sure) go on to win the case on the merits, and the error of granting an injunction to one who will go on to lose. The judge must try to avoid the error that is more costly in the circumstances. That cost is a function of the gravity of the error if it occurs and the probability that it will occur. The error of denying an injunction to someone whose legal rights have in fact been infringed is thus more costly the greater the magnitude of the harm that the plaintiff will incur from the denial and the greater the probability that his legal rights really have been infringed. And similarly the error of granting an injunction to someone whose legal rights will turn out not to have been infringed is more costly the greater the magnitude of the harm to the defendant from the injunction and the smaller the likelihood that the plaintiff's rights really have been infringed.
 
 
 34
 749 F.2d at 388 (emphasis supplied); accord American Hospital Supply Corp. v. Hospital Products Ltd., 780 F.2d 589, 593 (7th Cir.1986). Of course, in addition to minimizing the cost of an error to the parties, when, as in this case, granting or denying a preliminary injunction will have consequences beyond the immediate parties, the cost of an error to the public interest must also be weighed. Roland Machinery, 749 F.2d at 388.
 
 
 35
 We now must apply, with these principles in mind, the "abuse of discretion" standard to the district court's decision in the case before us.
 
 D. The Judgment of the District Court
 
 36
 Most of the discussion in the district court and in this court has focused on two of the traditional factors at issue when considering a preliminary injunction--the likelihood of success on the merits and the balance of harms. We shall consider each in detail.[6]
 
 1. Likelihood of Success on the Merits
 
 37
 The district judge first focused on the plaintiff's likelihood of success on the merits. He held that the DCFS procedures at issue did implicate fourth amendment concerns. E.Z., 603 F.Supp. at 1553. However, he found the visual inspection of the children's bodies was reasonable. In his view, the hot-line criteria set forth in the Handbook did not give the caseworker "unbridled discretion to examine the body of the alleged child victim." Id. at 1556. A warrant requirement or probable cause standard, held the court, would frustrate the purpose of the DCFS investigation since "quick action is essential. Common sense alone indicates that the fastest way to verify an abuse or neglect allegation is to observe the child." Id. at 1558. In response to the plaintiffs' argument that the five hot-line criteria were unreliable and needed verification from other sources to ensure reasonableness, the court replied:
 
 
 38
 Not only would such a proposed procedure require more manpower and a larger budget, the more serious problem with the procedure is that a delayed examination of a child may simply come too late to protect a child in imminent danger of grave bodily harm or even death. Unfortunately, there is no quicker way of knowing whether a child is at grave risk than by an actual examination of the child. Even assuming that most abuse situations are not life-threatening, this court finds that the life of even one child is too great a price to pay for the possible increased degree of parental privacy through additional preliminary investigation which plaintiffs' proposed procedure would demand.
 
 
 39
 Id. at 1559 (footnotes omitted).
 
 
 40
 Moreover, noted the court, further investigation and verification involving third parties could be even more intrusive than the examination:
 
 
 41
 Sharing an abuse report with a third party could stigmatize an accused abuser or family forever. Such a result would be especially unfair if the abuse report is ultimately found to be untrue as is often the case. The privacy interests of the child also militate against going to outside sources except as a last resort. Clearly a child, even before reaching adulthood, may wish that a report that he or she was abused by a parent or parents had never been publicized, even if true.
 
 
 42
 Id. at 1561 (footnote omitted). Such use of third parties, continued the district court, "may also create unnecessary hostilities between the worker and parent, thus detracting from the rehabilitative purpose of the child abuse investigation." Id.
 
 
 43
 With respect to the plaintiffs' claim that the DCFS procedures violated their right of privacy, the district judge simply noted that "the right to familial privacy does not prevent the state from protecting the dependent child from harm at the hands of a parent or caretaker. Id. at 1559.
 
 
 44
 a. Applicability of the Fourth and Fourteenth Amendments
 
 
 45
 We agree with the district court that the visual inspection conducted by government officials of those parts of the human body usually covered by clothing implicates fourth amendment concerns. The fourth amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. The Supreme Court has made clear that protection of the fourth amendment extends beyond those suspected of criminal behavior. Camara v. Municipal Court, 387 U.S. 523, 530, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967). Nor is the amendment's protection limited to encounters with the police. New Jersey v. T.L.O., 469 U.S. 325, 335, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985). A search within the meaning of the fourth amendment occurs when the government intrudes upon an individual's legitimate expectation of privacy. Illinois v. Andreas, 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983). The physical examinations conducted by the DCFS caseworkers include a visual examination of portions of the child's body which are normally covered by clothing. In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that a search protected by the fourth amendment occurs when an officer "frisks" a suspect. The Court noted, "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." Id. at 24-25, 88 S.Ct. at 1881-82. More recently, in T.L.O., the Supreme Court, citing Terry as an example, has also indicated that even a limited search of a person is a substantial invasion of privacy. 105 S.Ct. at 741. "A search of a child's person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy." Id. at 741-42. Indeed, in Doe v. Renfrow, 631 F.2d 91 (7th Cir.1980) (per curiam), cert. denied, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981), this court, adopting as its own the opinion of the district judge, Doe v. Renfrow, 475 F.Supp. 1012 (N.D.Ind.1979), held that "[s]ubjecting a student to a nude search is more than just the mild inconvenience of a pocket search, rather, it is an intrusion into an individual's basic justifiable expectation of privacy." 475 F.Supp. at 1024. Indeed, we added: "It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human decency." 631 F.2d at 92-93.
 
 
 46
 Once it is determined that a particular search is within the scope of the fourth amendment, it must be determined whether the search is permitted by that amendment. The fourth amendment prohibits only unreasonable searches. As the Supreme Court noted in T.L.O.:
 
 
 47
 Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place. The determination of the standard of reasonableness governing any specific class of searches requires "balancing the need to search against the invasion which the search entails." Camara v. Municipal Court, supra, 387 U.S., at 536-537, 87 S.Ct., at 1735. On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with breaches of public order.
 
 
 48
 105 S.Ct. at 741. Therefore, whether a search is "reasonable," in the constitutional sense, will vary according to the context of the search. For example, to ensure that a search by police of an individual's home for evidence of a crime is reasonable, the search must, under usual circumstances, be conducted pursuant to a warrant issued by a magistrate and based on probable cause. See Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). On the other hand, a search of a student's purse by a school administrator was reasonable because there were "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." T.L.O., 105 S.Ct. at 744.
 
 
 49
 In this case, in refusing to grant a preliminary injunction, the district court determined that a DCFS caseworker, without violating the strictures of the fourth amendment, could conduct a physical examination of the child as part of any investigation of alleged physical abuse. The court first concluded that neither a warrant nor probable cause were necessary in the context of the child abuse investigation. The district judge agreed with the defendants that requiring the DCFS to meet such a standard "ignores the problems resulting from children who are not old enough to speak, children who will not admit to being abused, parents who will not admit to abusing their children, parents who are unaware that their children are being abused." E.Z., 603 F.Supp. at 1560 (quoting Defendants Post-Hearing Memorandum in Opposition to Plaintiffs Motion for Preliminary Injunction at 7). In the opinion of the district judge, the fact that the discretion of the caseworker is circumscribed by the hot-line standards, as well as the child's ability to refuse to cooperate at any time, ensures that the search is reasonable. Id. at 1560 & n. 19. On this record, we believe that the district judge was correct in holding that the searches in question here could be conducted without meeting the strictures of probable cause or the warrant requirement. However, while we do not believe it is outcome determinative at this early stage of the litigation, we are somewhat less convinced, at least on this record, that a nude body search may be constitutionally conducted in every instance in which the hot-line criteria are met. We address in some detail each of these conclusions in the following subsections.
 
 
 50
 b. The Warrant or Probable Cause Requirement
 
 
 51
 In determining whether an investigative search in the child abuse context must meet the warrant or probable cause requirement, we must follow the methodology established by the Supreme Court of "balancing the need to search against the invasion which the search entails." T.L.O., 105 S.Ct. at 741 (quoting Camara, 387 U.S. at 537, 87 S.Ct. at 1735). The individual interests are easily identified. There can be little debate that the nude physical examination is a significant intrusion into the child's privacy. The caseworker not only questions the child about allegations against his parents but also disrobes the child and examines him, often in the presence of others and despite his parent's objection. Aside from the obvious embarrassment associated with the examination, the parties have submitted some evidence that this search can have a long-term negative impact on the child. The fact that other methods of investigation may be more intrusive does not reduce the substantial invasion associated with the examination. A child of very tender years may not exhibit a subjective expectation of privacy in the same sense as an older child. He is, however, a human being, entitled to be treated by the state in a manner compatible with that human dignity. Also at stake, of course, are the closely related legitimate expectations of the parents or other caretakers, protected by the fourteenth amendment, that their familial relationship will not be subject to unwarranted state intrusion. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); see also Bell v. City of Milwaukee, 746 F.2d 1205, 1243 (7th Cir.1984). "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents...." Santosky, 455 U.S. at 753, 102 S.Ct. at 1395.[7]
 
 
 52
 On the other hand, the state's interests are also extraordinarily weighty. Its obligations are multifaceted. The state has an obligation to prevent loss of life and serious injury to those members of the community to whom it has a very special responsibility, the young. As the Supreme Court remarked in Wyman v. James, 400 U.S. 309, 318, 91 S.Ct. 381, 386, 27 L.Ed.2d 408 (1971), "There is no more worthy object of the public's concern." We must also remember that the government must fulfill these responsibilities under difficult circumstances. Once a complaint is received, time can be an important factor, especially if the child is still in a situation where repetition of the alleged abuse is a possibility. A visual inspection provides quick and objective information. It can alleviate the need for any further inquiry or make plain the need for additional investigation. In 1982, seventy-one children in Illinois died as a result of child abuse. Def.Ex. 21 at 9. A child's life may be at stake in any of the thousands of reported cases each year. The state caseworker also has an important responsibility not to disrupt salutary familial relationships through extensive interrogations. The DCFS also recognizes that, because over sixty percent of the reported cases of child abuse are subsequently labeled unfounded, "[i]n a number of instances, ... the only family crisis which exists is that created by Department intervention." Handbook at 10. Nor are widespread inquiries of extra-familial sources, a technique bound to leave some stigma even when the subject of the investigation is entirely exonerated, always advisable. Moreover, we must also remember that, in undertaking this delicate inquiry, the state caseworker is dealing with a problem about which relatively little was known until recent times and where present-day knowledge is perhaps best described as "developmental." Precision in the identification of the child abuse situation--no less than in the treatment of the perpetrator and the victim--is not yet, unfortunately, an achievement of our society.
 
 
 53
 Moreover, while the visual inspection of the child's body may eventually result in a criminal prosecution against a child abuser, that contingency is certainly of secondary importance to the DCFS at the time the search is conducted. Of prime importance is the safety of the child, and the stabilization of the home environment. Under these circumstances, we cannot say that the Constitution requires that a visual inspection of the body of a child who may have been the victim of child abuse can only be undertaken when the standards of probable cause or a warrant are met. On this point, we believe the district court was correct.
 
 
 54
 c. Requirement of "Reasonableness"
 
 
 55
 A determination that a visual inspection of a child's body by a professional caseworker, or other professional acting for the DCFS, may be undertaken without "strict adherence," see T.L.O., 105 S.Ct. at 743, to the exacting standards of probable cause or the warrant requirement does not end our inquiry. Plaintiffs could still demonstrate a likelihood of success on the merits if they demonstrate, on this record, that the searches will be unreasonable. The "fundamental command of the Fourth Amendment is that searches and seizures be reasonable." Id.
 
 
 56
 The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.
 
 
 57
 Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). Therefore, keeping in mind that we are reviewing this matter on an appeal from the denial of a preliminary injunction, we must now assess whether this record supports the conclusion of the district judge that, criteria contained in the Handbook ensure that, under all circumstances, the searches conducted by the DCFS are reasonable.
 
 
 58
 Determining the reasonableness of a search involves, the Supreme Court has noted, two basic inquiries: (1) was the action "justified at its inception;" and (2) was the conduct of the search "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 19-20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). In this case, while both issues require our scrutiny, the first is clearly the principal focus of this controversy. Pursuant to the policy established in the Handbook and the Memorandum, the DCFS may conduct physical inspections based on any report of abuse, including an anonymous report, which merely meets the five hot-line criteria used for determining whether a caseworker should be assigned to investigate.
 
 
 59
 In the view of the district court, these hot-line criteria sufficiently circumscribed the discretion of the caseworker and ensured the reasonableness of the search. On this preliminary record, and keeping in mind the standards governing our review in preliminary injunction situations, we cannot definitively say that the district judge is wrong. However, at this point in the litigation, we remain unconvinced that the Handbook will ensure, in all cases, the reasonableness of the visual inspection. The record reflects that over fifty percent of the reported cases turn out after investigation to be unfounded. Def.Ex. 21 at 14. While we are aware of the need for quick verification and of the other considerations which could make corroboration of the hot-line report difficult or even counterproductive, we are somewhat skeptical that, at least in many, or perhaps even in most, cases a somewhat more careful inquiry may not be undertaken. We find disturbing that the Handbook does not appear to require, even in general terms, that the caseworker seek whatever verification of the report is permitted by the time and circumstances. Nor do we understand why the caseworker cannot be instructed to make, as time and circumstances permit, at least some effort to verify reports which are received from minors, anonymous callers, or sources whose reliability might be reasonably suspect. While third party verification can clearly be counterproductive under many circumstances, this record hardly supports the conclusion that it is inadvisable under all circumstances. We are also concerned that the Handbook does not differentiate between the search of the very young child and the search of a child with the maturity and ability to communicate. In further litigation, one of the principal issues will be whether the hot-line criteria are sufficiently precise to achieve the legitimate ends of the DCFS without amounting to a needless intrusion into the privacy of the child and his family. See United States v. Place, 462 U.S. 696, 706, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983); Florida v. Royer, 460 U.S. 491, 502, 503 n. 9, 103 S.Ct. 1319, 1326, 1327 n. 9, 75 L.Ed.2d 229 (1983) (plurality opinion); Reid v. Georgia, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980); United States v. Mendenhall, 446 U.S. 544, 547, 100 S.Ct. 1870, 1873, 64 L.Ed.2d 497 (1980). The DCFS may indeed be able to establish to the satisfaction of the trial judge and later to us and, possibly, the Supreme Court, that no more precise inquiry is possible under the circumstances.[8]
 
 
 60
 With respect to the manner in which the search is conducted, we also have, at least at this preliminary stage of the litigation, some question as to whether the present Handbook provides for adequate notice to the caretaker before a visual inspection is conducted outside the presence of the caretaker. It is also not clear why more precise instructions are not possible to ensure adequate respect for the maturity and the gender of the child.
 
 
 61
 We understand that the DCFS cannot anticipate and address every situation the caseworker may encounter. Nor do we suggest, of course, that it is the duty or the prerogative of this court or the district court to direct the specific contents of the Handbook. Indeed, judges must be especially careful not to hinder the constructive efforts of those faced with such an important governmental responsibility.
 
 
 62
 In further proceedings on the merits, perhaps the DCFS will be able to justify its current Handbook in each of these areas. We note that the incidents in the current record took place before the implementation of the Handbook and that the preliminary injunction hearing was conducted on the basis of rather abstract DCFS testimony of its policy under the Handbook rather than on the basis of the actual operation of the Handbook.[9] It may well be that additional and more concrete testimony as to the Handbook's actual operation will clarify these points. On the other hand, the DCFS' experience under the Handbook may, in light of our comments today, lead it to undertake voluntarily a revision of its operating procedures.
 
 
 63
 d. Summary
 
 
 64
 In sum, we agree with the district court that neither a warrant nor probable cause are necessary before the DCFS conducts these searches. However, we are not convinced, on the basis of the record before us, that the Handbook, as it now exists, ensures that the searches will always be reasonable. While the DCFS may indeed be able to justify the criteria established in the present Handbook, it is not entirely clear that the plaintiffs have no likelihood of success on the merits.
 
 2. Balance of Harms
 
 65
 The district court also concluded that, on balance, the potential harm to the defendants and public interest if the injunction were issued outweighed the potential harm to the plaintiffs if it were not. "Although plaintiffs may suffer loss of privacy," the district court concluded, "such a harm is not as great as injury or death to an innocent child." E.Z., 603 F.Supp. at 1563. While we are, as noted in the foregoing paragraphs, somewhat less convinced than the district judge that the present version of the Handbook will eventually withstand definitive constitutional scrutiny, our doubts, based only on the record of the preliminary injunction, cannot outweigh the countervailing concerns of human life and safety. Lawson Products, 782 F.2d at 1433, American Hospital Supply, 780 F.2d at 593, and Roland Machinery, 749 F.2d at 388, all emphasize that, in ruling on a preliminary injunction, the judge must try to avoid the error that is most costly in the circumstances. If we affirm the district court's denial of an injunction and the plaintiffs ultimately prevail at trial, some children will have been subjected to unreasonable, and therefore unconstitutional, physical examinations. On the other hand, if we reverse the district court and require that it grant a preliminary injunction, as the district judge stated, "it is likely that some child abuse would go undetected and some innocent lives unprotected." E.Z., 603 F.Supp. at 1563. The DCFS Handbook was carefully formulated by professionals dealing in a new, uncharted area. We have some misgivings about the final product. However, those misgivings may be answered at trial. Until the trial judge has had an opportunity to deal with this matter at a more mature stage of the litigation process, we cannot fault him for avoiding the most costly error of all--loss of human life. Accordingly, we affirm the district court's decision to deny the preliminary injunction.
 
 III
 
 66
 Darryl H., et al. v. Coler, et al.
 
 
 67
 This case, dealing with a search conducted under the Handbook, also comes to us at an early, although different, stage of the litigation process. Here, the plaintiffs seek retrospective money damages for alleged deprivation of their constitutional rights under color of state law. Specifically, they alleged that the search of their two children by a DCFS caseworker in a room adjoining the principal's office at school violated their rights protected by the fourth, fifth, ninth and fourteenth amendments. They claim that the search of their children was violative of the right to be free from unwarranted state intrusion into family privacy and the right to be free from an unreasonable or warrantless search. The district court granted the defendants' motion for summary judgment. On this record, we do not believe that the defendants have established, with the clarity required of the movant on summary judgment, that the rights of the plaintiffs were not violated. However, since a proper application of the eleventh amendment and the doctrine of qualified immunity bar recovery of damages in this case, we affirm the judgment of the district court.
 
 A. Facts
 
 68
 In October 1982, the DCFS received a report from a "mandated reporter" that two children had been abused or neglected. A "mandated reporter" is a person required under Illinois law to report instances of child abuse. The statute includes several groups of professionals, including teachers, social services workers and medical personnel. Ill.Rev.Stat. ch. 23, p 2054. In their amended complaint, the plaintiffs alleged that the "mandated reporter" was the principal of the children's school or a subordinate staff member.[10] They further alleged that the report was made in bad faith since the parents had a continuing argument with the school authorities over whether the children should be required to eat their lunch at school. According to the amended complaint, the parents wanted their children to eat lunch at home and finally produced a note from their physician stating that the children should eat at home. While the defendants have never officially divulged the name of the "mandated reporter," Appellees' Br. at 5 n. 2, the report of the caseworker submitted in support of the motion for summary judgment indicates that she interviewed the principal. The appellants note that the principal voluntarily admitted in her deposition that she made the report. Appellants' Br. at 5. The report alleged that: Lee H., age six, was tied up for punishment. Lee and his sister, Marlena, age seven, were thin and not allowed to each lunch at school, and the children's clothes and bodies were dirty. Since the report met the hot-line criteria of the Handbook, a DCFS caseworker was assigned to investigate the allegations.
 
 
 69
 The caseworker began her investigation by interviewing the children's mother and stepfather at their home. During the interview, the caseworker checked the refrigerator and kitchen cupboards and found sufficient food for the children. Following the home interview and observation, both parents accompanied the caseworker to the children's school. Out of the presence of their stepfather, the caseworker questioned the children about the alleged abuse. Both children denied any abuse or neglect. They told the caseworker that they ate meals, bathed and changed clothes daily. The caseworker observed that although Lee H.'s body and clothing were dirty, Marlena H. was clean. The record also shows that the caseworker interviewed the principal who told her that both parents were usually angry when they came to school, that "something strange" was going on in the family, that, on that day, the children were the cleanest they had ever been since school started, that other students indicated Lee was tied up for punishment, and that bruises had never been observed on the children. The caseworker required the children to disrobe. The examination of each child's body was conducted in a semi-private room near the principal's office with the other child present. The mother was also present during this procedure and assisted in removing the children's clothes. The parents maintain, however, that they objected to this inspection. The caseworker claims that no objection was made. The parents allege that, during the search, the door to the principal's office was partially open and that the examination could be observed by those in the principal's office. The caseworker claims that the door was closed.
 
 
 70
 The children and their parents filed suit against the caseworker and several DCFS officials in both their official and individual capacity. R.3. The complaint alleged that the defendants, under the color of state law, deprived them of rights protected by the fourth, fifth, ninth and fourteenth amendments.[11] See 42 U.S.C. Sec. 1983 (1982). Initially, the plaintiffs requested both injunctive and monetary relief. However, pursuant to the plaintiffs' oral motion, the court ordered the request for injunctive relief stricken. R.9. The district court granted the defendants' motion for summary judgment. It held that the visual inspection did not violate the fourth amendment for three independent reasons: (1) The mother, by assisting the caseworker during the examination, consented to the search; (2) even assuming there was no consent, the physical examination was not a search within the meaning of the fourth amendment; and (3) even if the procedure was a search, "defendants' conduct does not descend to the level of unreasonableness." Darryl H. v. Coler, 585 F.Supp. 383, 388 (N.D.Ill.1984). The court also decided that the state's interest in protecting the children outweighed any right to parental autonomy contained in the fourteenth amendment. Id. at 391-92.
 
 
 71
 The appellants argue that the district court erroneously concluded that the examination was not an unreasonable search and necessarily resolved genuine issues of fact against the plaintiffs to find that the search was made with consent. On appeal, the defendants argue not only that the district court's decision was correct but also submit that the eleventh amendment and the doctrine of qualified immunity prohibit recovery of money damages in this case.
 
 B. Eleventh Amendment
 
 72
 Recently, the Supreme Court reaffirmed the holding of Edelman v. Jordan, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974), that the eleventh amendment prohibits a federal court from imposing retrospective monetary relief on a state for past violation of a federal law. Green v. Mansour, --- U.S. ----, ----, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985). In Brandon v. Holt, 469 U.S. 464, 471, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985), the Supreme Court made clear that a suit against a public servant "in his official capacity" imposes liability on the entity he represents. The DCFS is a state agency; it was established by state statute and is funded by the state. Ill.Rev.Stat. ch. 23, p 2051 et seq. Therefore, the suit against the individual defendants in their official capacity, seeking retrospective monetary damages, is a suit against the state. The eleventh amendment[12] prohibits this court from granting the plaintiffs the retrospective money damages they seek from the defendants in their official capacities. Therefore, the suit against the DCFS and against the individual defendants in their official capacities is dismissed for lack of subject matter jurisdiction.[13] It remains to determine the liability of the defendants in their individual capacities.
 
 
 73
 C. The Constitutionality of the Visual Inspection
 
 
 74
 We respectfully disagree with the district court's determination that, on motion for summary judgment, the defendants have established the constitutional legitimacy of the visual examinations. As we have already noted in our disposition of the companion case, B.D. by C.D. v. Coler, No. 85-1611, the inspection is clearly a search subject to the strictures of the fourth amendment. Nor can we approve of the district court's holding that, as a matter of law, the inspection was conducted with consent. In our view, the matter of consent turned on the resolution of disputed issues of fact. It is not permissible to hold, as a matter of law, that the mother's assistance in the procedure amounted to her consent. Indeed, it is difficult to imagine a mother, faced with the strip searching of her two young children in a public building, doing anything other than staying and attempting, by her presence, to alleviate the understandable apprehension of her children.
 
 
 75
 Finally, we are not convinced, at least on this record, that the constitutional legitimacy of the search has been established--despite the defendants' compliance with the five hot-line criteria. As our analysis in the companion case reveals, we are not yet convinced that the hot-line criteria alone are sufficient to ensure that a search is necessary and reasonable. In this case, by the time the visual inspection of the children was undertaken, the caseworker was in possession of information which cast serious doubt on the validity of the charge. The children's home situation revealed no evidence of abuse; the children themselves denied any mistreatment; there was some evidence that the complainant was, in light of her earlier disagreement with the parents, not entirely objective. More importantly, it appears that additional information could have been obtained quite easily and without creating any appreciable embarrassment for the children or the parents. The principal's only source of information that Lee H. was tied up for punishment was the report of an undisclosed number of children in one of the primary grades. There is no indication in the record that the caseworker made any effort to corroborate the principal's complaint by discrete inquiry of faculty members who had frequent contact with the students to ascertain the basis, if any, for this allegation.
 
 
 76
 Perhaps it would have been possible for the DCFS, on a more complete record, to establish that such further inquiry would not have been useful in determining the necessity of a visual inspection. On this record--as on the record in the companion case--we do not believe that, as a matter of law, the defendants have established that the searches were constitutional.
 
 D. Qualified Immunity
 
 77
 The individual defendants submit that the doctrine of qualified immunity protects them from personal liability. Qualified immunity is an affirmative defense[14] which protects public officials from liability even if they have violated a plaintiff's constitutional rights. Davis v. Scherer, 468 U.S. 183, 190, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984). "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity means more than relief from liability; it means immunity from suit. A defendant entitled to qualified immunity should not be required to proceed to trial. Mitchell v. Forsyth, 472 U.S. 511, ----, 105 S.Ct. 2806, 2816 86 L.Ed.2d 411 (1985). "On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. Accordingly, to determine whether the defendants are entitled to summary judgment, we must decide whether, at the time the DCFS conducted the physical examinations, the law clearly established the plaintiffs' right not to be subjected to that investigative procedure.
 
 
 78
 Neither the Supreme Court nor any other circuit has addressed the application of the fourth or fourteenth amendment in the context of a child abuse investigation. The American Civil Liberties Union, in its Amicus Brief, noted that the application of the fourth amendment to child abuse investigations presents a case of first impression in this circuit. Amicus Br. at 6 n. 3.[15] In the companion case, B.D. by C.D. v. Coler, supra, we have held that the visual inspections at issue here are subject to the strictures of the fourth amendment. We have also held, however, that, on that record, it is not possible to assess definitely whether visual examinations conducted pursuant to the hot-line guidelines are reasonable.
 
 
 79
 Under these circumstances, we believe that the individual defendants in this case are protected from damage liability by the doctrine of qualified immunity. Since we cannot determine the constitutionality of the procedures employed by the DCFS without a more fully developed record, we can hardly maintain that the individual defendants should have known that their efforts to fulfill their public responsibilities violated a clearly established constitutional right. Accordingly, regardless of whether the physical examination is ultimately found to be unconstitutional, the defendants, in their individual capacity, are entitled to summary judgment.
 
 CONCLUSION
 
 80
 In B.D. by C.D. et al. v. Coler, No. 85-1611, the judgment of the district court is affirmed.
 
 
 81
 In Darryl H. et al. v. Coler, No. 84-2757, inasmuch as the plaintiffs' complaint seeks damages against the defendants in their official capacities, the judgment of the district court is vacated and the complaint is dismissed. Inasmuch as the complaint seeks damages against the defendants in their individual capacities, the judgment is affirmed. In both actions, all parties shall bear their own costs.
 
 
 82
 SO ORDERED.
 
 
 
 [1]
 Joanne Selinske, an expert in the field of child abuse and the American Bar Association representative who worked with the Illinois Department of Children and Family Services (DCFS) on the child abuse investigation procedures, testified that it is only recently that states and the federal government have become involved in efforts to address the problems of child abuse. Tr. 1491-95. Dr. Katherine E. Vedder, an assistant professor of pediatrics at the University of Illinois, also testified that, as an academic and practical field, the area of child abuse and neglect is relatively young. Tr. 973. The Child Abuse and Neglect Investigation Decisions Handbook developed by the DCFS is considered a model for governments to follow. Appellees' Br. at 4
 
 
 [2]
 In both cases, the plaintiffs originally argued that both the DCFS policy of searching the home and examining the child's body were unconstitutional. On appeal, the plaintiffs in Darryl H., have not argued that the home search was unconstitutional. Although the plaintiffs in B.D. by C.D., continued to challenge the constitutionality of the home search, for a variety of reasons, those plaintiffs actually subjected to the home search are no longer before the court. Therefore, the court can only address the DCFS policy which permits routine examinations of the child's body for evidence of abuse or neglect
 
 
 [3]
 The investigations involved in this case all occurred before the DCFS published its guidelines in the Handbook and the Memorandum. The plaintiffs seek to enjoin future physical examinations. They allege not only that the examinations were conducted in an unconstitutional manner, but also that in any subsequent child abuse investigation they will again be subjected to the allegedly unconstitutional investigative procedures. We agree with the district court that these plaintiffs have standing to challenge the DCFS policy. See City of Los Angeles v. Lyons, 461 U.S. 95, 105, 103 S.Ct. 1660, 1666, 75 L.Ed.2d 675 (1983); E.Z. v. Coler, 603 F.Supp. 1546, 1550-52 (N.D.Ill.1985)
 
 
 [4]
 This court is without jurisdiction to consider the interlocutory orders denying class certification and denying leave to add additional parties after the denial of the motion for a preliminary injunction. These are not final orders. Nor do we believe that either order "directly control[s] or [is] in some way inextricably bound to the denial of the preliminary injunction so as now to merit review." Shaffer v. Globe Protection, Inc., 721 F.2d 1121, 1124 (7th Cir.1983). In any event, it is clear that the district court did not abuse its discretion in denying either motion
 
 
 [5]
 The district court also concluded that the plaintiffs had consented to the searches. E.Z. v. Coler, 603 F.Supp. 1546, 1557 (N.D.Ill.1985). While we have some serious doubts that the plaintiffs voluntarily agreed to the searches, we need not consider the question. The proper focus is on the constitutionality of future searches. The DCFS may conduct searches which would otherwise be unconstitutional if they obtain appropriate consent. However, to determine whether future searches should be enjoined we must assume that they would be conducted without consent
 
 
 [6]
 The district court also concluded that should the plaintiffs prevail at trial, money damages would provide an adequate remedy at law. However, in light of our holding in the companion case, Darryl H. v. Coler, No. 84-2757, money damages may not be available as a remedy in this case. In any event, we do not believe that this contingency is a controlling factor in this case
 
 
 [7]
 Fourteenth amendment due process analysis obviously differs in some respects from fourth amendment analysis. However, for present purposes, we believe both interests can be treated together. Whether substantive due process rights are at stake, see Moore v. City of East Cleveland, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (plurality), or procedural due process rights are at stake, Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599 (1982), a court must essentially weigh the privacy interest of the family member against the interests of the government. The same basic analysis is utilized under the fourth amendment
 
 
 [8]
 When exigent circumstances arise, the caseworker may constitutionally conduct a search to protect the child. We are not willing to hold that every report which meets the hot-line criteria constitutes exigent circumstances. Indeed, the DCFS makes no such argument. We note, for instance, that the report involving A.O. was investigated four months after it was made
 
 
 [9]
 See supra note 3
 
 
 [10]
 The amended complaint also named the principal as a defendant. The plaintiffs have voluntarily dismissed her. R.62. Pursuant to Fed.R.Civ.P. 54(b), the district court entered a final judgment. R.58
 
 
 [11]
 The plaintiffs have abandoned their fifth amendment claims. Darryl H. v. Coler, 585 F.Supp. 383, 385 n. 6 (N.D.Ill.1986). With reference to their fourteenth amendment claim, see supra note 7
 
 
 [12]
 The eleventh amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any Foreign State." U.S. Const. amend. XI
 
 
 [13]
 The district court did not address the eleventh amendment issue. However, it is a question of subject matter jurisdiction which may be raised at any time in the litigation. Edelman v. Jordan, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974)
 
 
 [14]
 The defendants preserved their defense by pleading it as an affirmative defense in their answer to the plaintiffs' complaint. R.10
 
 
 [15]
 The Wisconsin Supreme Court has held that the entry into a home by a social worker looking for evidence of child abuse is a search within the meaning of the fourth amendment. State v. Boggess, 115 Wis.2d 443, 340 N.W.2d 516 (1983)