# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-1883

JOHN TERRY, individually and as the
natural father and next friend of
Jaidah Terry, a minor,

*Plaintiff-Appellee*,

v.

CHERRY RICHARDSON,

*Defendant-Appellant*.

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 97 C 1198—**John A. Gorman**, *Magistrate Judge.*

———————

ARGUED APRIL 15, 2003—DECIDED OCTOBER 10, 2003

———————

Before FLAUM, *Chief Judge*, RIPPLE, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Cherry Richardson, an investigator with the Illinois Department of Children and Family Services ("DCFS"), told John Terry not to visit his three-year-old daughter, Jaidah, during an investigation into charges that John sexually abused Jaidah. John contends that Richardson acted without appropriate notice or a hearing and without enough evidence and that these shortcomings violated his and Jaidah's Fourteenth Amendment rights to procedural and substantive due process. A

jury found for John and Jaidah (whose claims we can treat as one for purposes of our analysis), and Richardson appeals, arguing that the defense of qualified immunity entitles her to judgment as a matter of law. Because there was no constitutional violation in the first place, we agree that Richardson should prevail and reverse.

## I. BACKGROUND

John and Richelle Terry married in 1990 and divorced three years later. Under their divorce decree, Richelle received sole custody of Jaidah, the couple's only child. John was awarded reasonable visitation, which included his birthday and Father's Day as well as two consecutive days every other week (to be determined by his work schedule), ten consecutive days in the summer, and various other occasions (including Jaidah's birthday) on which he and Richelle alternated visitation.

By 1995, Richelle was living with her boyfriend and his three children, and John had moved in with his mother and stepfather while he went to school. At some point Richelle noticed that when Jaidah returned from visits with John she appeared "withdrawn." She also observed that Jaidah resisted visiting her father, generally feared adult men (including Richelle's own boyfriend), and had begun wetting her bed.

Suspecting that John may have abused Jaidah, Richelle, on April 30, 1995, asked her daughter whether she had any "secrets." According to Richelle, Jaidah eventually responded that John hurt her, kissed her "pee-pee," forced her to swallow a necklace, tried to make her kiss his "noodle," and jammed crayons and a pen into her anus. Upon hearing this information, Richelle promptly contacted Jaidah's pediatrician and on the doctor's advice called DCFS's child-abuse hotline.

The next morning DCFS assigned Richardson to investigate, and she began by informing the state police that to assure Jaidah's safety, her plan (known as a "safety plan") was to eliminate contact with John during the investigation. Richardson then telephoned Richelle, who repeated the allegations that she had made the night before and supplied additional details. She explained that according to Jaidah her father had threatened to kill her if she revealed the abuse and that Jaidah had disclosed the "bad secret" only because she thought that she would not have to see John again. Richelle also relayed that John had admitted to sharing a bed with Jaidah at his mother's house, that his mother and stepfather recently had been away traveling, and that she believed the abuse occurred at their home. Richelle finally told Richardson that the following day was Jaidah's fourth birthday and that she did not want John to see her.

Richardson next called John and left a message on his answering machine with her name and telephone number. According to John, she also said, "Your child has been indicated in an abuse situation. You are to cease all visitation and contact with her." After leaving this message, Richardson and another investigator visited Richelle's home and scheduled a formal interview later in the week with Jaidah. Richelle at this time stressed that she was concerned about John seeing Jaidah for her birthday, to which Richardson replied that she should "try to defer him." Richelle then told John that Jaidah was too ill to see him.

The following day, May 2, John returned Richardson's call. He asked to know the nature of the charges, and Richardson responded that she could not tell him over the telephone. John then explained that he could not meet with Richardson for at least a week because he had final exams; he also said that he had not seen Jaidah very much recently due to his work and school schedule. Richardson repeated that he was not to contact Jaidah, to which John replied,

"okay" or "I understand." According to Richardson, she understood from John's response that he intended to comply with her safety plan, so she did not pursue other options for preventing contact with Jaidah.

Later that morning, Richardson spoke with Jaidah's pediatrician, Dr. Lynn Greeley, who had examined Jaidah the day before for signs of sexual abuse. Dr. Greeley said that Jaidah's genitalia were abnormal, that her anus was "lax and easily opened," that her hymen possibly was scarred, and that she complained of pain around her fourchette. Dr. Greeley's findings were corroborated a week later by a second pediatrician, Dr. Kay Saving, who reported that Jaidah had a dilated anus and fourchette scarring. Because these findings were "very compatible with a history of sexual abuse," Dr. Saving recommended immediate counseling.

Richardson, accompanied by another DCFS investigator and a state police investigator, interviewed Jaidah on May 3. In response to Richardson's questions—which John's expert characterized at trial as unduly suggestive— Jaidah said that her father had made her have bad dreams, choked her, called her stupid, and put beads in her mouth. After the police investigator left the room, telling Jaidah on his way out that it was "okay to tell," Richelle joined the interview and held Jaidah on her lap. Jaidah replied "no" when Richardson asked if her father rubbed "his noodle on her pee-pee," but when her mother repeated the question, Jaidah said "yes it hurt."

Richardson interviewed John at his attorney's office on May 16—two weeks after their initial conversation. She identified the allegations against him and provided a DCFS brochure describing the investigation process. John denied inappropriate contact with Jaidah and said that Richelle had previously made unfounded charges of child abuse against her own father. He also said that Richelle was manic-depressive and twice had attempted suicide.

At the end of the interview, Richardson again told John not to contact Jaidah during the investigation, which she explained could last up to 90 days. Neither John nor his attorney asked Richardson whether his compliance was required or questioned her authority to interfere with his visitation. According to John, he refrained from contacting Jaidah because he had learned from "news reports and things" that ignoring DCFS instructions could lead to termination of his parental rights or Jaidah's placement in a foster home.

Richardson closed her investigation on June 16 and filed a final report "indicating" John for sexual penetration, exploitation, and molestation. Richardson left a message for John, in which she explained her findings and asked him to call with any questions. According to John, he never received this message and did not learn that the investigation had ended until he received a letter from DCFS telling him that he had 60 days to appeal the indicated finding (a process that he began but later abandoned).

On June 16, the same day that Richardson closed her investigation, Richelle obtained an ex parte order that prohibited John from taking custody of Jaidah. At a hearing held three weeks later, John agreed to the terms of the interim order, and Richelle then petitioned to terminate his visitation entirely. The court, after more than a year of proceedings, found that Jaidah had been sexually abused, but not by John, and denied the petition. Within a week John began seeing Jaidah again.

John then brought this action under 42 U.S.C. § 1983 against Richardson (and a number of other defendants not relevant to the appeal) on behalf of himself and Jaidah. After a magistrate judge denied cross motions for summary judgment, the case was tried on John's procedural and substantive due process theories. The jury awarded $2,062 to John and $7,210 to Jaidah, and after denying Richardson's

motions for judgment as a matter of law and a new trial, the court awarded attorneys' fees.

## II. ANALYSIS

On appeal, Richardson's principal contention is that she is entitled to judgment as a matter of law because qualified immunity blocks John's claims. In evaluating this defense, the first question is whether Richardson violated a constitutionally protected right; if so, we turn to whether this right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Payne v. Pauley*, 337 F.3d 767, 775-76 (7th Cir. 2003). Given the jury's verdict, the facts are viewed as favorably as possible to John. But because juries are not authorized to determine the substance of the Constitution, the legal question whether a constitutional violation occurred is reviewed de novo. *McNair v. Coffey*, 279 F.3d 463, 466 (7th Cir. 2002); *see also Bell v. Irwin*, 321 F.3d 637, 640-41 (7th Cir. 2003).

### A. Interference With a Protected Interest

Like the parties, we assume that noncustodial parents, such as John, have a constitutionally protected interest in visiting their children. All agree that this interest is an aspect of parents' right to "care, custody, and control" of their offspring. *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (collecting cases). The disagreement concerns whether Richardson's conduct interfered with this interest.

According to Richardson, no interference occurred because reasonable people in John's position would have understood that they did not need to follow her instruction not to visit Jaidah. No one has suggested that Richardson could unilaterally alter the terms of John's divorce decree or that she could force him to comply with her safety plan. Indeed,

DCFS's deputy director, Edward Cotton, testified without contradiction that absent a court order, cooperation is essential to separate parents suspected of abuse from their children.

Richardson's argument proceeds by analogy to the law governing seizures of criminal suspects. As Richardson rightly observes, a seizure does not occur when the police approach people on the street and pose questions, ask for identification, or request consent to search their belongings—provided that cooperation is not induced by coercive means. *United States v. Drayton*, 536 U.S. 194, 200-01 (2002); *United States v. Childs*, 277 F.3d 947, 950 (7th Cir. 2002) (en banc). Fourth Amendment protections arise only when a reasonable person would not feel free to leave the police presence, or if leaving is impractical, when a reasonable person would not feel free to "decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991); *United States v. Jerez*, 108 F.3d 684, 689 (7th Cir. 1997).

John does not argue that these rules form an inappropriate framework for analyzing claims of official interference with noncustodial parents' visitation with their children. The treatment indeed is sensible because interference with the parental right to "care, custody, and control" ordinarily is measured through the objective lens of the Fourth Amendment. *E.g.*, *Doe v. Heck*, 327 F.3d 492, 520 (7th Cir. 2003); *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000); *Darryl H. v. Coler*, 801 F.2d 893, 901 n.7 (7th Cir. 1986). Nor does John contend that his proffered explanation for obeying Richardson—his having heard on television that disobeying DCFS caseworkers could spell the end of his parental rights or lead to foster care for Jaidah—was reasonable. John argues instead that regardless of whether he knew that Richardson could not prevent him from visiting his daughter, he was required to obey her commands. Just as motorists must halt immediately when

the police order them to stop, *see McNair*, 279 F.3d at 465, John insists that he could not ignore Richardson's instructions.

In one respect, John has a point. On May 1—when Richardson first called John—he had no information other than what was furnished in the message left on his answering machine. Based on that message, a reasonable person might not have realized immediately that Richardson could not override his divorce decree or force him to submit to her safety plan.

But just one day later, John had an opportunity to speak with Richardson and ask about the scope of her authority. And within two weeks of that conversation, John had enlisted an attorney and met with Richardson—a meeting that was delayed by a week because of his final exams. By then, a reasonable person with the resources available to John, would not have left Richardson's authority unquestioned, just as reasonable motorists (to borrow John's analogy) do not remain stopped on the roadside for weeks after the officer who ticketed them drives off. John's contention that Richardson prevented him from seeing Jaidah *after* she wrapped up her investigation on June 16 thus is doubly unpersuasive: Richardson only a month earlier said not to see Jaidah *during* the investigation, and she never suggested that she would have an ongoing role in the case.

Given that the May 16 meeting at the attorney's office was postponed by a week at John's request and that his divorce decree entitled him only to biweekly visitation, Richardson's conduct deprived John of association with Jaidah at most for one day—her May 2 birthday. We say "at most" because the record could support a finding that Richardson was not even responsible for this missed visit. Jaidah's mother after all was the one who told John that Jaidah was too sick to see him on her birthday. But given the jury's verdict, we assume that John acted on account of

Richardson's instruction instead of Richelle's lie, meaning that the case comes down to whether this one-day interference is enough to sustain John's procedural and substantive due process claims.

### B.  Procedural Due Process

We start with procedural due process. John contends that he was entitled to notice and a hearing either before or immediately after Richardson instructed him not to visit Jaidah. John observes that noncustodial parents must be notified and offered a hearing before their parental rights are terminated, *see Santosky v. Kramer*, 455 U.S. 745, 758-70 (1982), and likewise that predeprivation process—except in emergencies—is required before the state removes children from their custodial parents' care, *e.g.*, *Brokaw*, 235 F.3d at 1020; *Batten v. Gomez*, 324 F.3d 288, 295 (4th Cir. 2003). But these decisions add nothing because Richardson did not try to sever John's parental rights or take Jaidah from his custody. Losing a single day of visitation differs in kind and duration from the deprivations cited by John, which is significant because the gravity of his loss determines the process to which he is entitled. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Morrell v. Mock*, 270 F.3d 1090, 1095 (7th Cir. 2001); *Gottlieb v. County of Orange*, 84 F.3d 511, 521-22 (2d Cir. 1996).

Here John's interest—one day of visitation with Jaidah—is slight, as illustrated by the fact that work and school often kept him from seeing Jaidah before the investigation began. In at least two circuits, this loss might be so tiny that it simply does not amount to a deprivation of liberty. *See Zakrzewski v. Fox*, 87 F.3d 1011, 1014 (8th Cir. 1996); *Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir. 1981). Richardson has not relied on the approach taken by these courts, so we need not decide whether John's interest is too insignificant to be actionable. *See Hessel v. O'Hearn*, 977

F.2d 299, 302-04 (7th Cir. 1992) (discussing de minimus constitutional violations). It is enough to say that the deprivation is minor compared with the state's substantial interest in protecting children like Jaidah from sexual abuse. *See Doe*, 327 F.3d at 520; *Berman v. Young*, 291 F.3d 976, 983-84 (7th Cir. 2002); *Brokaw*, 235 F.3d at 1019.

This disparity affects what process is due. Where the loss is small, due process does not require elaborate procedures in advance, *e.g.*, *Wozniak v. Conry*, 236 F.3d 888, 890 (7th Cir. 2001)—assuming that predeprivation process is required at all, *Fitzgerald v. Williamson*, 787 F.2d 403, 408 (8th Cir. 1986) (an opportunity to litigate in state court after the fact suffices when noncustodial parents' visitation is reduced after their children enter foster care); *cf. Ingraham v. Wright*, 430 U.S. 651, 676-82 (1977) (same result for corporeal punishment in public schools). Here John could have contacted Richardson before Jaidah's birthday and explained that he had never abused his daughter. And upon learning that Richardson had no authority to tell him not to visit Jaidah, John could have brought suit in state court for damages and declaratory relief. *Cf. Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (postdeprivation remedies satisfy due process where the loss is caused by "random and unauthorized" conduct); *Parratt v. Taylor*, 451 U.S. 527, 541-42 (1981) (same). Or he could have refused to comply with Richardson's instruction, which would have forced judicial intervention to keep him away. *See Ellis v. Hamilton*, 669 F.2d 510, 515 (7th Cir. 1982). Given the interests at stake, the options available to John were enough to guard against erroneous interference with his rights.

### C. Substantive Due Process

That leaves John's substantive due process claim. John may maintain this claim despite receiving all the process to which he was entitled, *Zinermon v. Burch*, 494 U.S. 113,

125 (1990); *Daniels v. Williams*, 474 U.S. 327, 331 (1986), by showing that he was subjected to arbitrary government action, *Tenenbaum v. Williams*, 193 F.3d 581, 600-01 (2d Cir. 1999). During child-abuse investigations of parents who have custody of their children, arbitrary abuses of government power are checked by requiring objective justification for steps taken during the investigation. Thus, caseorkers who come between parents and their children— for example, by taking protective custody of the children— must have evidence to support a "reasonable suspicion" of past or imminent abuse. *Brokaw*, 235 F.3d at 1019; *Berman*, 291 F.3d at 983-84; *see also Croft v. Westmoreland County Children & Youth Servs.*, 103 F.3d 1123, 1126-27 (3d Cir. 1997).

Likewise, if Richardson had possessed the authority to force John not to see Jaidah, she would have needed adequate grounds for her action. Potentially, she would have needed less justification than caseworkers who interfere in custodial parents' relationships with their children, but we can bypass that question given the evidence available here. Before calling John on May 1, Richardson had spoken to Richelle on the telephone and confirmed the allegations made in her hotline report the previous night. Richardson also learned from Richelle that John had allegedly threatened to kill Jaidah if she revealed the abuse, that John had shared a bed with Jaidah when she visited him overnight, that his parents had recently been away, and that he was planning to see Jaidah the following day.

This information adds up to a reasonable suspicion of past and imminent harm, which later developments did not dispel. To the contrary, one day after John was told not to see his daughter, Jaidah's pediatrician reported findings consistent with sexual abuse. Those results were confirmed a week later by a second doctor, and throughout the investigation Jaidah never suggested that anyone other than John had hurt her. In light of this evidence, John's substantive due process claim is foreclosed.

   We recognize that the actual separation between John and Jaidah lasted for more than a year and undoubtedly was a source of significant difficulty for them both. But as we explained at the outset, no reasonable person in John's position would have treated Richardson's instruction as a bar to visiting Jaidah for such a long period. Because there was no constitutional violation, it is unnecessary to reach the second step of the qualified immunity analysis, which asks whether John's rights were clearly established at the time Richardson acted. Our resolution also makes it unnecessary to discuss Richardson's other arguments, though we note that the award of attorneys' fees must be vacated since she is now the prevailing party.


### III.  CONCLUSION

   The judgment of the district court is REVERSED.


A true Copy:

　　　　Teste:


　　　　　　　　　　　　_____
　　　　　　　　　　　　*Clerk of the United States Court of*
　　　　　　　　　　　　*Appeals for the Seventh Circuit*